[Crim. No. 13931. Fourth Dist., Div. One. Sept. 21, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE EDWARD SUMMERS, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Victoria Sleeth, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Patricia D. Benke and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COLOGNE, Acting P. J.**—George Edward Summers appeals his court-tried conviction and sentence to prison for second degree murder with use of a firearm (Pen. Code,[1] §§ 187, 12022.5). The trial court first found Summers guilty of first degree murder but reduced the degree pursuant to section 1181.

On September 28, 1981, Summers went to a bar and found a person who could lead him to Larry Wood, went home, put on a shirt and cowboy hat, armed himself with a loaded .38 revolver, drove a car other than his own to Wood's residence, entered with gun drawn and shot Wood in the chest, killing him, while the two struggled for control of the gun.

Several weeks earlier, Summers sold some amphetamines to Wood who had come to Summers' residence with another man to make the purchase. Wood told his wife how easy it would be to steal narcotics from Summers and returned to Summers' place, stealing $500 to $600 worth of amphetamines and some cash. Summers later told his roommate, Marina Villalpando (Rina), he thought she had set him up for the theft and he announced they were not going to get away with it; no one rips him off. Summers found out Rina had a friend named Larry who was bragging about ripping people off. He also determined Mark Martin (Marcos), another friend of Rina, knew Larry. He saw Marcos at the bar in the evening of September 28 and Marcos mentioned Larry·Wood owed him some money and a shirt. Summers said he, too, had some business with Larry and volunteered to give Marcos a ride if he would show him where Wood lived. Marcos agreed and the two left, first going to Summers' home where he armed himself, unknown to Marcos, and donned a cowboy hat and outer shirt. He also changed cars, driving away in a Volkswagen "bug" belonging to a customer of his upholstery business instead of his Mercedes which he had at the bar. When they parked near Wood's apartment, Summers took with him a wad of cotton upholstery material that was in the car.[2]

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] The prosecution argues this was used to muffle the sound of the gun, but the evidence is not clear exactly how it was used.

At Wood's door, Marcos knocked and was invited in, but the door was locked. Wood then came to the door and, as Marcos said something about Wood having his shirt, Summers stepped by Marcos and, waving the gun, in the air, pushed Wood back. As Wood backed up, Summers said "[y]ou stole my dope, punk," to which Wood responded, "[y]ou got the wrong guy. I didn't do it. Let's talk about it." Summers lowered the gun as he got closer and pushed it against Wood's chest. Wood grabbed the gun's barrel and a struggle ensued, during which a first shot went into a wall. Marcos heard someone coming up the stairs to Wood's apartment, closed the apartment door and began walking away. He told the person on the stairs, Wood's son, not to go into the apartment. When he was at the bottom of the stairs, Marcos heard a second shot. Wood, mortally wounded, staggered out of the apartment and fell over the railing to the ground below. Wood's wife was in the apartment and witnessed most of Summers' attack on her husband.

Summers caught up with Marcos who told him he did not know what he did but to get away from Marcos. Summers complied, driving away leaving Marcos behind. Later, Summers threw away the gun as well as the hat and shirt he wore at the killing.

Summers' defense essentially consisted of his testimony he sought out Wood to find out if he was the one who stole his amphetamines and money and to locate his son who was the subject of some threatening telephone calls after the theft and who could not be located on the day of the killing. Summers claimed his amphetamines were stolen at gunpoint and the robbers had threatened to harm his son if he reported the crime. He denied intending to kill Wood, explaining he took the cotton wadding to shove in Wood's mouth as the amphetamine robbers had done to him, not to silence the gunfire. He testified his first question to Wood was "[w]here is my boy?" and Wood said, "[y]ou've got the wrong guy," to which Summers said "no." Wood then said, "[l]et's talk," and Summers responded "[y]ou stole my dope, punk." Wood then started backing around the front door. Summers thought he was going for a weapon and lowered the gun to point it at Wood's chest at which time the struggle ensued.

Summers offered explanations for the incriminating evidence against him.

■ He contends the judgment must be reversed with instructions to enter a judgment of acquittal or must be modified to reduce the verdict to involuntary manslaughter because there was insufficient evidence of implied malice to constitute second degree murder.

The contention cannot prevail because it relies on evidence and inferences which were not accepted by the trial court as trier of fact. ■ Summers'

argument contravenes the basic rule: "We 'must view the evidence in a light most favorable to [the People] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] The People may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he committed it. [Citations.] If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.]' (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 . . . ; see also *People* v. *Johnson, supra,* 26 Cal.3d 557, 575-577 [162 Cal.Rptr. 431, 606 P.2d 738].)" (*People* v. *Love* (1980) 111 Cal.App.3d 98, 106 [168 Cal.Rptr. 407].)

■ On the question of malice, we apply the following definition outlined by this court in the *Love* case, *supra,* 111 Cal.App.3d 98, as we review the substantiality of the evidence: ". . . Penal Code section 188 defines implied malice as '. . . when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' . . .

" 'The mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim. [Citation.] When a defendant " 'with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death,' " he acts with malice aforethought. [Citations.]' . . . Malice is evidenced 'by circumstances indicating that the killing was proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " . . .' [Citation.]

". . . In each such case where malice is found, there is an element of viciousness—an extreme indifference to the value of human life. [Citation.] It is where a defendant, free from any mental impairment or not acting in the heat of passion or on adequate provocation, makes a voluntary choice to commit a person-endangering act. [Citation.]" (*People* v. *Love, supra,* 111 Cal.App.3d 98, 105-106.)

Malice, of course, can be "express," which is manifested by evidence showing a deliberate intent unlawfully to kill (Pen. Code, § 188).

■ Viewing all of the evidence, as we must (*People* v. *Johnson* (1980) 26 Cal.3d 557, 577 [162 Cal.Rptr. 431, 606 P.2d 738]), but doing so in a

light most favorable to the People, it is clear Summers entertained malice. His barter of a ride to find out where Wood lived, his making a special trip to arm himself with the means to effect deadly force on Wood, his concealment of the revolver even from Marcos, his efforts to confound the possibility of identification by changing his attire and vehicle and his immediate confrontation of the retreating Wood with revolver pointed to Wood's chest accompanied by the words rejecting Wood's attempt to talk it out, all demonstrate Summers' determination to engage in activity involving a high probability death would result. The facts show intentional conduct evidencing extreme indifference to the value of human life. Summers entertained malice. Substantial evidence supports the conclusion of the trial court as trier of fact that Summers is guilty of second degree murder.[3]

Judgment affirmed.

Lewis, J.,* concurred.

**WIENER, J.,** Concurring.—I add the following comments because there are some troublesome aspects to this case which I believe warrant further discussion. I have a general concern that courts using circular reasoning may be giving only lip service to *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. While giving token acknowledgment that *Ireland* precludes application of the felony-murder rule where the underlying felony is assault with a deadly weapon, courts appear nonetheless to find the defendant guilty of second degree murder solely because the killing occurred in the commission of an assault with a deadly weapon. My specific concern here is this problem may have been compounded by the possibility the trial court failed to consider Summers' guilt of the necessarily included offense of involuntary manslaughter. I have resolved these concerns by concluding the trial court weighed the facts against the range of potential verdicts and substantial evidence supports the judgment.

The People's theory at trial was that Summers had committed a premeditated and deliberate first degree murder. The prosecutor focused on Summers' activity before the killing, the nature of the killing and the motive of retaliation in response to the victim's stealing of Summers' drugs. Summers

---

[3]We find somewhat misleading Summers' attempt to label as findings certain statements of the trial court during the motion hearing considering reduction of degree. We observe that after all the trial court's statements Summers quotes or partially quotes as if they were findings, the court informed counsel "I am listening to both of you. I still have an open mind." The statements were merely points of discussion between court and counsel, not findings.

*Assigned by the Chairperson of the Judicial Council.

defended by urging a finding of justifiable homicide, a killing in self-defense, or at most manslaughter.

In this appeal, Summers has a different slant. He now labels the manslaughter as involuntary and primarily focuses on the court's alleged failure to consider that finding in its deliberations. Although involuntary manslaughter was clearly a legal choice on the facts presented, it was not seriously advocated at trial and only briefly mentioned in Summers' new trial motion. It is the colloquy at closing argument in the court trial and at the hearing on the new trial motion which Summers contends reflects the court's misunderstanding of the scope of homicide. For example, he refers to the following:

"The Court: [The prosecutor has told me] that even if the court believes everything that the defendant said, it would be second degree murder. It would certainly not be manslaughter, and I think that it's evident that he was the aggressor, the one who pointed the gun . . . .

". . . . . . . . . . . . . . . . . . ". . . . . .

"What would anybody do with a gun pointing at him . . . ? [Defense counsel] pointed out on page 19 of [his points and authorities, in discussing implied malice] that 'the pointing of a loaded firearm in and of itself is not necessarily an inherently dangerous act.' I disagree with that.

". . . . . . . . . . . . . . . . . . ". . . . . .

". . . Assuming that this man came in with a gun pointing upwards to either scare him or to find out where his boy [was] . . . and [then pointed] the gun at him . . . let's assume that that was his intent. And then the victim seizes the gun as any reasonable, prudent man would. There is a struggle, and the gun fires twice, once to the side and the next one into the heart of the victim. What do we have there?

"[The Prosecutor]: . . . At the very least you would have second degree murder.

"The Court: . . . I don't think I'm going to grant a new trial. There is nothing that would really justify me granting a trial. Why don't you address the issue of first degree.

". . . . . . . . . . . . . . . . . . ". . . . . .

". . . I am really not interested in manslaughter. I am sure it is not manslaughter. We're talking only about first and second."

It would be manifestly unfair to draw the inference from these selective statements that the trial judge was unaware of the applicable law. The comments were made in a context of vigorous debate during which each counsel stressed specific facts having legal consequences favorable to his position. The court's comments were neither findings nor statements of legal principles. The judicial musings were nothing more than self-directed rhetorical hypotheticals used to isolate and analyze the relevant legal principles. It would be a disservice to the trial bench and to this conscientious judge to necessarily label as findings those statements exchanged in a quest for the correct legal propositions to apply. Moreover, the court's difficulty in selecting the correct legal pigeonhole for Summers' conduct is understandable. Malice is an amorphous legal concept, easier to recognize than to articulate.

Penal Code section 188 furnishes the rather opaque definition that malice ". . . is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." An abandoned and malignant heart is shown when ". . . the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1], Traynor, J., conc.)

Central to the arguments of both the prosecutor and defense counsel was whether malice could be implied from the evidence. The prosecutor cited *People* v. *Butterfield* (1940) 40 Cal.App.2d 725 [105 Cal.Rptr. 628] to explain how malice could be found: "When an unlawful assault is made with a deadly weapon upon the person of another, resulting in death, and the assault is not provoked or perpetrated in necessary self-defense, or in the heat of passion, malice may be presumed. Under such circumstances, the killing may constitute murder of the second degree when it is not perpetrated by means of poison, lying in wait, torture or any other kind of wilful, deliberate or premeditated killing." (*Id.*, at p. 729.) These statements of the law may have formed the basis for later statements made by the court and prosecutor (see pp. 182-183, *ante*) in which they discussed the pointed gun.

I disagree with those statements. I believe a finding of implied malice may not be based on the single act of pointing a gun, isolating that fact from all the other facts and circumstances surrounding the use of the weapon and the later killing. If gun use were the sole criterion for second degree murder the merger doctrine developed from *People* v. *Ireland, supra,* 70 Cal.2d 522 would have no practical effect.

*Ireland* held it was error to give a second degree felony-murder instruction when it was based upon the felony of assault with a deadly weapon. Since an assault is an integral part of homicide, it is an offense included in fact within homicide. (*People* v. *Ireland, supra,* 70 Cal.2d at p. 539.) The court explained to apply the felony-murder rule to an assault would extend the rule beyond the rational function it was designed to serve, i.e., to deter felons from killing negligently or accidentally. (*Ibid.*) The facts of *Ireland* made the "bootstrapping" finding of malice particularly troublesome because it would have substantially eviscerated a diminished capacity defense. (*Id.,* at p. 539, fn. 13.)

*Ireland* was limited to its facts (70 Cal.2d at p. 540) and for a short time it appeared that the holding only applied to cases where a diminished capacity defense was raised. (See *People* v. *Fain* (1969) 70 Cal.2d 588, 598 [75 Cal.Rptr. 633, 451 P.2d 65] (felony second degree murder rule instruction based on assault with a deadly weapon was not prejudicial error where no diminished capacity defense was raised).) However, in *People* v. *Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22], the principle expressed in *Ireland* was expanded. There, a burglary based upon the felony of assault with a deadly weapon was also found to be an offense included within a charge of murder. (*Id.,* at p. 441.) The court expressly adopted the so-called merger doctrine which was accepted in other states, such as New York. (*Id.,* at p. 442.) The holding was not based on prejudice to the defendant's defense, but instead focused on the lack of a rational basis for the felony-murder rule when the underlying felony is part of a homicide. (See Comment, *Merger and the California Felony-Murder Rule* (1972) 20 UCLA L.Rev. 250, 265-266, fn. 74.)

The result from *Wilson* is only felonies independent of a homicide can support a felony-murder instruction. Felonies that are an integral part of a homicide are merged into the homicide and the trier of fact must independently find the required elements for the murder, i.e., malice.

In *People* v. *Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], the defendant was charged with murder based on an alleged attack on his victim with a deadly weapon. Defendant attacked the reading of the implied malice instruction (CALJIC No. 8.31) because it did not preclude the jury from implying malice from a dangerous act which was itself an integral part of the homicide. (10 Cal.3d at p. 755.) In other words, if an assault with a deadly weapon cannot be used to impute malice through the felony-murder rule, it cannot be used to imply malice either.

The court rejected this assertion because defendant's argument was predicated on the assumption that the second degree murder-implied malice in-

struction is the functional equivalent of the second degree felony-murder instruction. (*People* v. *Poddar, supra,* 10 Cal.3d at p. 756.) This is not the case. There is one crucial and controlling distinction between the two situations governed by the instructions. Under the felony-murder instruction, if the intentional commission of the underlying felony is shown, no further findings need be made in order to convict of murder. Under the second degree murder-implied malice instruction, however, ". . . the mere finding that the underlying act had been committed is not enough; it must be further found that the act was done for a 'base, antisocial purpose with wanton disregard for life' [citation]—that is, with malice aforethought . . . ." (*Ibid.*)

The important rule emanating from these cases is that something more than the intent to commit assault with a deadly weapon must be shown in order to find malice. Since "[a]n assault with a deadly weapon can be proved without proof of malice" malice is found not from the mere fact of assault, but "from the *circumstances* surrounding the commission of an assault that results in murder." (*People* v. *Goodman* (1970) 8 Cal.App.3d 705, 708 [87 Cal.Rptr. 665], disapproved on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].) Thus, it is essential that a trier of fact appreciate that "something more" be established than merely an assault with a deadly weapon in order to find a defendant guilty of second degree murder. I would hope that after *Ireland* courts would eschew the pre-*Ireland/Butterfield* reasoning (but see, e.g., *People* v. *Lines* (1975) 13 Cal.3d 500, 506 [119 Cal.Rptr. 225, 531 P.2d 793]; *Walker* v. *Superior Court* (1980) 107 Cal.App.3d 884, 889 [166 Cal.Rptr. 209]) restricting their analysis to the reasoning of the merger line of cases.

As reflected in this court's opinion, there is ample evidence to establish the "something more" from Summers' conduct. The trial court rejected Summers' statements he was anxious over the well-being of his son and impliedly found he knew the victim would hardly acquiesce to the violent nature of Summers' confrontation. The earlier events between the parties made death a predictable consequence of Summers' act. Thus Summers is guilty of second degree murder not because death resulted in the commission of an assault with a deadly weapon, but because substantial evidence drawn from all the circumstances supports a finding of unlawful killing done with malice. Accordingly, I concur in the judgment.