[No. A035130. First Dist., Div. Three. Dec. 3, 1987.]

In re RUSSELL H., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
RUSSELL H., Defendant and Appellant.

[Opinion certified for partial publication.†]

† Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part IV.

**COUNSEL**

Robert Y. Bell and Richard R. Dale for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MERRILL, J.**—A juvenile court found that appellant Russell H., a minor, committed second degree murder (Pen. Code, §§ 187, 189).[1] It also determined that he used a firearm in the commission of this offense within the meaning of section 12022.5. The court ordered that the youth be retained as a ward of the court and committed to the California Youth Authority.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

# I

On the morning of January 24, 1986, appellant was at home in Rohnert Park. With him were his sister, Tiffany, his stepbrother, Robert, and a friend, Jerry. Appellant's father was at work. Appellant's stepbrother, Robert, received a phone call from an acquaintance by the name of Blaine. Blaine was at the house of Eric Sparks, the victim, and called for the purpose of selling some "speed or crank." Robert told Blaine that he was not interested in buying drugs but that he would ask others at his house to see if they were.

In response to Robert's inquiry, Tiffany indicated that she was not interested in buying any drugs but that appellant might be since he was going to a concert later that day. Appellant, it turns out, was interested in buying some drugs but was not sure he had enough money to pay for them. Appellant, Jerry, and Tiffany discussed the possibility of going to Sparks's house and stealing the drugs. Around this time, appellant entered his father's locked bedroom and removed an unloaded .357 Magnum handgun from a desk drawer and a box of ammunition from a dresser. He carried it into the kitchen. Robert, who was in the kitchen at the time, asked to see the gun. After looking at the gun, Robert told appellant to put it away. Appellant asked Robert if he thought he should load the gun. Robert said, "No, don't even do that. That would be stupid." Appellant told Robert that he just wanted to use the gun to scare Sparks into "fronting" the drugs, i.e., give them the drugs upon promise of payment later. Thereafter, Tiffany called Blaine and Sparks on the phone inviting them to the residence. While waiting for Blaine and Sparks to arrive, appellant continued to play with the gun, and at some point loaded it.

After Blaine and Sparks arrived, they were invited into the kitchen. In the kitchen, the two displayed a plastic box containing two plastic baggies with drugs. They passed the baggies around inviting everyone to try the drugs. Blaine and Sparks were asked the price of the drugs. After they had quoted a price, the group engaged in some argument over the price. Appellant and Jerry left the kitchen ostensibly to look for appellant's money. Once in appellant's bedroom, however, appellant showed Jerry the gun and told him, "We're going to take the speed."

Appellant and Jerry rejoined the others. They asked Sparks if he would lower his price. He indicated he would not. Appellant then asked him to front the drugs. When Sparks refused to do so, appellant pulled out the gun from his pants and cocked it. He began waving the gun around. He then pointed the gun at Sparks and said, "Won't you front me the drugs?" Sparks continued to refuse. Appellant started to walk around Sparks continuing to point the gun at him. He told Sparks, "Look, man, I'm not joking

around, I could put your head all over this kitchen if I wanted to. . . . I could take your life in five seconds."

At this point, Robert returned the sample drugs to Sparks and told him to put them away. He wanted to put an end to the transaction because he thought it had gone far enough. He told appellant to stop pointing the gun at Sparks and to put the gun down. Jerry also told appellant to get the gun away from Sparks's head. When appellant continued to wield the gun, Robert went over to him and tried to take the gun away. The record is somewhat unclear as to what happened next. However, Robert would later testify that as he tried to take the gun away, appellant's finger was on the trigger and the gun went off fatally wounding Sparks.

## II

A petition was filed against appellant in juvenile court charging him with first degree murder (§§ 187, 189). The petition alleged that the murder was committed in the course of an attempted robbery (§§ 187, 189), that appellant committed attempted robbery (§§ 664, 211), and that he used a firearm in the commission of the offenses (§ 12022.5).

A hearing was held after which the court found appellant committed second degree murder. The court found the firearm allegation true but found the attempted robbery allegation not true. It also found that appellant did not intend to kill Sparks. In support of its findings, the court said: "I will imply malice from the commission of the unlawful act, the assault with a deadly weapon without sufficient provocation and tending to show that the circumstances showed an abandoned or malignant heart on your part and that the act was committed for a base and antisocial purpose and with wanton disregard for human life. I find that from the circumstances surrounding the commission of this offense, namely: the statements made by the minor in the period just before the actual shooting, that this was done in a circumstance surrounding a drug deal, and that even though people around him were asking him not to fire the gun—or to put down the gun, he did not put the gun down and kept it pointed at the victim."

These statements were later augmented by the court as follows: "And the court finds and has found that in this particular case there were certain factors which can be relied on other than the assault with a deadly weapon surrounding this act in order to find the actions showing a wanton disregard for human life or a base and antisocial purpose, namely: that the defendant specifically went and found and loaded a gun; that this was a drug-related event; that there was testimony, which the court accepts, that apparently there were statements made during the course of the pointing of the gun

which indicated that the victim was told by the minor that he could blow him away at any moment; and, finally, that the minor eschewed the advice of those around him to put the gun down."

Appellant appeals from the court's jurisdictional findings and order, the order denying his motion for a new hearing and the order of disposition. We affirm.

## III

■■■ Appellant contends that the lower court's findings do not support the verdict. He maintains that the lower court, in reaching its verdict, relied on the wrong legal authority—i.e., cases wherein there had been a finding of an intentional killing. Appellant's argument is without merit.

Section 187, subdivision (a), provides that "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." Under section 188, malice may be express or implied, and implied malice is present "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Section 189 defines first degree murder as all murder committed by specified lethal means "or by any other kind of willful, deliberate, and premeditated killing," or a killing which is committed in the perpetration of enumerated felonies; all other kinds of murder are of the second degree.

■■■ "[S]econd degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" *People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].)

■■■ In the instant case, the lower court based its second degree murder verdict on a finding of implied malice. It based its finding of implied malice on the following facts: appellant's commission of an unlawful act, assault with a deadly weapon, without sufficient provocation; appellant's acts prior to the actual shooting including his locating and loading of the gun and his pointing the gun at the victim while telling him that he could end his life within a matter of seconds; the drug-related aspect of the incident where appellant is demanding the drugs without paying for them and the victim is refusing to give them up; and appellant's disregard for the advice of those

around him to put the gun down. Accordingly, the court's finding is supported by substantial evidence and the verdict is supported by the finding.

Appellant's contention that the lower court relied on erroneous authority is incorrect. In issuing its verdict, the court cited *People* v. *Goodman* (1970) 8 Cal.App.3d 705 [87 Cal.Rptr. 665], disapproved on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441, 451 [99 Cal.Rptr. 313, 492 P.2d 1]; and *People* v. *Summers* (1983) 147 Cal.App.3d 180 [195 Cal.Rptr. 21], both second degree murder cases involving an assault with a deadly weapon.

In *Goodman,* the court was attempting to explain the rationale behind the California Supreme Court's holding in *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged. According to *Goodman,* the high court in *Ireland* "was primarily concerned that where an assault is an integral part of the murder it is not really a separate felony as contemplated under the felony-murder doctrine. An assault with a deadly weapon can be proved without proof of malice. Therefore, . . . to permit application of the felony-murder doctrine would permit a conviction of murder resulting from an assault with a deadly weapon without proof of malice." (*People* v. *Goodman, supra,* 8 Cal.App.3d at p. 708.) Based on this, the *Goodman* court held: "Implying malice from the circumstances surrounding the commission of an assault that results in murder comports with, rather than offends, the *ratio decidendi* of *Ireland.*" (*Ibid.*)

And in *People* v. *Summers, supra,* 147 Cal.App.3d 180, a case which the lower court found factually similar to the case at bar, the facts were these: Defendant sold some amphetamines to Larry Wood, the victim. Sometime later, Wood returned to defendant's house and stole between $500 and $600 worth of amphetamines and some cash. Defendant suspected Wood of the burglary. One evening at a bar, defendant ran into one of Wood's friends, a man known as Marcos. Marcos told defendant that Wood owed him some money and a shirt. Defendant offered to give Marcos a ride to Wood's residence if he would show him where Wood lived. Marcos agreed and the two left the bar, stopping first at defendant's home where defendant armed himself, unknown to Marcos, and changed clothes. Defendant also switched cars.

Once at Wood's residence, Marcos knocked on the door. Wood answered the door and defendant pulled out a gun and started waving it in the air. Defendant pushed Wood back into the apartment. As Wood backed up,

defendant said " '[y]ou stole my dope, punk,' " to which Wood responded, " '[y]ou got the wrong guy. I didn't do it. Let's talk about it.' " Defendant lowered the gun as he got closer and pushed it against Wood's chest. Wood grabbed the gun's barrel and a struggle ensued, during which a first shot went into a wall. Marcos heard someone coming up the stairs to Wood's apartment, closed the apartment door and began walking away. When he was at the bottom of the stairs, Marcos heard a second shot. Wood, mortally wounded, staggered out of the apartment and fell over the railing to the ground below. Wood's wife was in the apartment and witnessed most of defendant's attack on her husband.

Defendant was convicted of second degree murder and appealed. The sole issue on appeal was whether there was sufficient evidence of malice. Finding that there was, the appellate court said, "Viewing all of the evidence, as we must [citation], but doing so in a light most favorable to the People, it is clear Summers entertained malice. His barter of a ride to find out where Wood lived, his making a special trip to arm himself with the means to effect deadly force on Wood, his concealment of the revolver even from Marcos, his efforts to confound the possibility of identification by changing his attire and vehicle and his immediate confrontation of the retreating Wood with revolver pointed to Wood's chest accompanied by the words rejecting Wood's attempt to talk it out, all demonstrate Summers' determination to engage in activity involving a high probability death would result. The facts show intentional conduct evidencing extreme indifference to the value of human life. Summers entertained malice. Substantial evidence supports the conclusion of the trial court as trier of fact that Summers is guilty of second degree murder." (*People* v. *Summers, supra,* 147 Cal.App.3d 180, 184-185.) We find the trial court's reliance on *Goodman* and *Summers* to be appropriate. The facts surrounding the offense support a finding of implied malice.

It is appellant and not the trial court who relies on inapplicable authority. Appellant, in his brief, cites the "Washington-Gilbert line of cases" (i.e., *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130] and *People* v. *Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]) in support of his arguments. However, this line of cases concerns the felony-murder doctrine and its misapplication by the trial court in certain cases where the actual killing is committed by someone other than the perpetrator of the crime (e.g., in *People* v. *Washington, supra,* an accomplice of the accused was killed by the victim of a robbery; and in *People* v. *Gilbert, supra,* an accomplice of the accused was killed by a policeman during a robbery). The felony-murder doctrine is not at issue in the case at bench.

Appellant's argument that the lower court's treatment of unintended homicide as murder violates the traditional distinction between murder and manslaughter is similarly faulty in view of the statutory definition of murder.

IV*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

V

The orders determining that appellant should be retained a ward of the juvenile court and committing him to the Youth Authority are affirmed without modification.

Scott, Acting P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied December 30, 1987, and appellant's petition for review by the Supreme Court was denied March 23, 1988.

---

*See footnote, *ante,* page 916.