Filed 1/18/23  P. v. Tracchia CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B315752 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA033116) |
| v. | |
| GLENN MATTHEW TRACCHIA, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Juan Carlos Dominguez, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Glenn Matthew Tracchia, Jr. (defendant), appeals from the order denying his petition filed pursuant to Penal Code former section 1170.95 (now § 1172.6).[1] Defendant contends the trial court erred by treating the evidentiary hearing held pursuant to section 1172.6, subdivision (d) as a trial de novo, and certain of the trial court's findings are subject to issue preclusion under the principles of res judicata and collateral estoppel. Defendant also contends the trial court applied an erroneous standard of proof at the evidentiary hearing, and this court should conduct its own independent review of the record to determine whether the prosecution met its burden of proof. We find no merit to defendant's contentions and thus affirm the order.

## BACKGROUND

In 1997 defendant and his codefendant Steve Erenesto Mejico were each convicted by a jury of the second degree murder of Robert Imperial with true findings that a principal was armed with a firearm and that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote and assist in criminal conduct by gang members. Defendant was sentenced to 16 years to life in prison. We affirmed the judgment in *People v. Tracchia* (B117379, Oct. 19, 1998) (nonpub. opn.).

---

[1] Effective June 30, 2022, Penal Code former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) For the sake of simplicity, we will refer to the section by its new number.

All further unattributed code sections are to the Penal Code unless otherwise stated.

2

**Relevant 1997 trial evidence**[2]

The parties stipulated at trial that the Dogpatch gang is a criminal street gang.  The prosecution's gang expert, Los Angeles County Sheriff's Deputy Tommy Harris, testified that he was familiar with the Dogpatch gang, which committed crimes such as robberies, burglaries, narcotics offenses, and assaults.  He added that crimes against other gang members were usually assaultive.  David Valdez, who was also convicted of Imperial's murder, was an admitted member of the gang, as were defendant and Mejico.  Deputy Harris testified that respect in gang culture is important, and if the member of one gang disrespects another gang or one of its members, it can precipitate a rivalry.[3]  It is common when a gang or one of its members is disrespected that other members of that gang will try to regain respect by fighting with members of the rival gang, leading to greater violence.  Regaining respect can range from "fighting or jumping somebody, all the way to murder."  It is also common for gang members to carry weapons, mostly handguns.

On July 15, 1996, Imperial, his cousin Thomas Fierro and his cousin's friend Tom Bushnell went to Valdez's house.  Bushnell was a tattoo artist and Valdez a client.  Neither Bushnell nor Fierro belonged to a gang.  When Bushnell introduced his companions, Valdez said to Imperial, "This is Dogpatch.  Where are you from?"  Imperial replied he was from La Mirada, meaning the Varrio La Mirada gang.  After drinking

---

[2]     We summarize the evidence from our own review of the 1997 transcripts in order to add context to our discussion.

[3]     Deputy Harris explained that the question, "Where are you from?" is intended to mean "what gang do you belong to?"

beer and smoking marijuana outside the house for approximately 45 minutes, they went inside. At some point Valdez called Bushnell into another room and asked whether Fierro and Imperial were both from La Mirada. Bushnell replied only Imperial was from La Mirada and offered to leave if there was a problem. Valdez told him not to worry, to "go ahead and kick back." About a half hour later first Valdez telephoned someone and then Imperial made a call, after which Valdez again used the telephone.

About half hour after the phone calls, a car arrived. Valdez opened the door, and defendant, Mejico, and an unidentified man entered the house. They introduced themselves to Fierro and Bushnell and identified themselves as Dogpatch gang members. Imperial told them he was "Porky" from La Mirada. Valdez, Mejico, and the unidentified man went into the kitchen and spoke among themselves, while defendant sat on the couch in the living room next to Imperial and Fierro.

When Valdez, Mejico, and the unidentified man came out of the kitchen, Mejico asked Imperial, "Where are you from again?" When Imperial again said, "Porky from La Mirada," Mejico replied, "Oh, we have to talk," or "Oh. Oh. We have to talk." Defendant, Mejico, Valdez, and the unidentified man positioned themselves two in front of Imperial and two behind him and "escorted" him outside to the front yard. One of them tried to shut the door behind them, but Fierro kept it open and sat on the corner of the couch so that he could watch as they stood in a semicircle surrounding Imperial for approximately 20 minutes. Defendant, Mejico, Valdez, and the unidentified man appeared to be trying to explain something to Imperial, and on about four occasions the four men would huddle together and talk, then

4

return to Imperial.  At some point Fierro became concerned because of the look on Imperial's face, and he and Bushnell went outside to ask what was happening.  Imperial said not to worry, that it was "just bull shit."  At Imperial's request, Fierro and Bushnell went back inside but kept the door open.

Valdez came inside after about 10 minutes and went into his bedroom.  Three to five minutes later he came out with a thick jacket and returned outside.  Defendant and Mejico, followed by Imperial and then Valdez, walked toward a gray or blue car that had not been there when Fierro had arrived at the house.  The car was later identified as the blue Buick Regal owned by defendant's grandmother, which defendant regularly drove.  Fierro ran outside and asked, "[W]here are you going?" Imperial told Fierro to go back inside and Valdez said they were going to buy beer and marijuana.  Imperial got into the back seat of the car with Valdez, while defendant and Mejico got into the front seat, and the car sped away.  The unidentified man remained behind and appeared to be watching Fierro and Bushnell.

About 10:00 or 10:30 that evening, Eduardo Segoviano was walking down Wing Lane when he heard loud, angry voices and saw two men pushing Imperial against a fence near a flood control channel.  One man was pushing Imperial, and the other was striking him.  Imperial broke away and ran in Segoviano's direction as the assailants chased him, and then one of the assailants fired a gun.  Segoviano hid in a yard and heard more gunshots in quick succession.  He saw flashes, but did not see the gun or which man had the gun.  After the gunfire stopped, Segoviano heard tires spinning and the sound of a car driving

5

away.  When Segoviano emerged from hiding, the men were gone. He then saw Imperial lying in a yard.[4]

Another witness was in his nearby driveway when he heard a sound "like a backfire or a gunshot."  When he looked in the direction of the sound, he saw a Buick Regal in the middle of the intersection with its headlights off.  The witness heard two more gunshots before he saw the car speed away.

About 15 to 20 minutes after defendant and his companions had left with Imperial, the Buick Regal screeched to a stop in front of Valdez's house. (B117379 1 RT 96-97, 160)~ As Valdez got out, the unidentified man ran outside and got into the car, which sped away with its headlights off.  Valdez hurried into the house sweating and looking shocked.  He went to the bathroom, washed his face and hands before going into his bedroom, then went to his roommate's bedroom.  When he came out he told everyone to get out.  Both Fierro and Bushnell asked several times where Imperial was, but Valdez kept telling everyone to leave without answering them.

Fierro and Bushnell went outside, where they saw Valdez come out, go to the side of the garage, and retrieve something wrapped in a piece of clothing.  Bushnell approached and saw that Valdez was carrying a gun wrapped in a red rag.  Valdez ordered Bushnell to "just fucking leave" and took the gun inside the house.

---

[4]  Imperial was pronounced dead at the scene.  He died from a single gunshot wound that penetrated his back, perforated a lung, and pierced his heart before lodging in the muscles of his chest.  The path of the bullet was consistent with being shot while Imperial was running away.

The next morning Valdez telephoned Bushnell and said, "[H]e's gone, huh?" Bushnell asked him, "[W]hy did you have to kill him?" Valdez replied that he had to shoot Imperial because "La Mirada was talking smut about Dogpatch."

During a search of Valdez's house a .38-caliber revolver and ammunition were recovered from Valdez's bedroom. An expended bullet found at the scene of the shooting and the bullet recovered from Imperial's body were determined to have been fired by Valdez's gun. Prior to defendant's trial Valdez pled guilty to second degree murder. Valdez claimed defendant and Mejico got out of the car with Imperial, and he remained in the car, where he heard a gunshot before defendant and Mejico returned to the car without Imperial.

**Section 1172.6 proceedings**

In 2018, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which amended the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature also added what is now section 1172.6, which provides a procedure for those convicted of murder to seek retroactive relief if they could not be convicted under sections 188 and 189 as amended effective January 1, 2019. (Stats. 2022, ch. 58, § 10; Stats. 2018, ch. 1015; *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

On January 7, 2019, defendant filed a petition for vacatur of his murder conviction and resentencing pursuant to section 1172.6. As relevant here, the petition alleged that he had been

7

charged with murder, that he was convicted pursuant to the natural and probable consequences doctrine, and that he could not now be convicted of murder because of the changes made to sections 188 and 189, effective January 1, 2019. After the trial court summarily denied defendant's petition, this court reversed the order and remanded for further proceedings in *People v. Tracchia* (Feb. 17, 2021, B300730) (nonpub. opn.).

On remand, the superior court received briefing from both sides, issued an order to show cause, and held an evidentiary hearing pursuant to subdivision (d) of section 1172.6. As defendant presented the trial court with a facially adequate petition, the court issued an order to show cause why relief should not be granted and scheduled an evidentiary hearing. (See § 1172.6, subds. (c), (d); *People v. Lewis, supra*, 11 Cal.5th at p. 971.) At such an evidentiary hearing the prosecution is required to prove beyond a reasonable doubt that defendant is guilty of murder, attempted murder, or manslaughter under amended sections 188 and 189. (§ 1172.6, subd. (d)(3).) The prosecution and the petitioner are permitted to offer new or additional evidence, and "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law [except hearsay admitted at preliminary hearing], including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).) The trial court acts as an independent factfinder and determines whether the prosecution has met its burden. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).) Here, neither the prosecution nor the defense offered new evidence.

The trial court indicated it had considered the documents submitted by the parties, selected portions of the trial testimony,

8

the appellate opinion and the argument of counsel. The court issued a memorandum of opinion setting forth the following factual findings:

"There is no doubt that Petitioner was present when the decedent was killed. . . . [¶] Although it is possible that the only thing Petitioner thought was going to take place at this remote location was the assault of the decedent, said interpretation of the circumstantial evidence is not reasonable for the following reasons.

"Upon arriving at the Valdez residence, the decedent was immediately challenged as to his gang affiliation. In response to Valdez' question he stated he was from the 'La Mirada' street gang. Thereafter two phone calls followed, with Petitioner and the other two arriving about an hour later. They went into the kitchen and spoke. Petitioner again asked the decedent what gang he claimed, and after the decedent responded, he stated 'Oh . . . we have to talk homey.' The discussion moved outside, and it appeared that the decedent was trying to explain something and had a concerned look on his face. During the discussion the gentlemen huddled together and spoke amongst themselves away from the decedent.

"Immediately thereafter, Valdez went inside the house and came out holding a jacket. The circumstantial evidence points strongly to the fact that Valdez went to retrieve the gun. They then drove the decedent to a remote location where he was killed. Valdez told Tom Bushnell shortly after the shooting that he had killed the decedent because he had been 'talking smut about Dogpatch'.

"At trial Sgt. Harris testified as follows:

9

"Q: 'How is disrespect by one gang or one gang member or another gang towards another gang member answered by the gang or gang member disrespected?' . . .

"A: 'Well, they're going to go and try to regain that respect. It could be as little as fighting or jumping somebody, all the way to murder'.

"There appears to be no logical reason for taking the decedent to a remote location if the intent was simply to assault him. They were at Valdez' private residence and the assault could have taken place right there and then. Furthermore, there appears to be no logical reason for the various separate discussions that took place prior to driving the decedent from the residence. Finally, the decedent was outnumbered 4 to 1. There appears to be no logical reason to retrieve a gun if the intent was only to assault. The circumstantial evidence strongly points to the conclusion that during the course of the various discussions the decision was made to kill the decedent. That explains why, prior to driving away from the location, Valdez went inside the residence to retrieve the gun.

"As the prosecutor stated during her argument at the eligibility hearing 'the decedent was never going to come back alive once he got into the car with Petitioner and the others'. The court agrees with this conclusion.

"Lastly, the evidence established that only two of the individuals exited the car and chased the decedent. The other individual, who was most likely the Petitioner as the vehicle was his, remained with the car and it is possible that he may have not been aware that the other two were going to kill the decedent. The circumstantial evidence, however,

10

strongly points to the conclusion that the decision to kill the decedent was made prior to the decedent entering the car and that by virtue of the various discussions, all were aware what was going to happen to [him]."

The trial court concluded from its findings "that the prosecution has proven each element of first or second degree murder beyond a reasonable doubt and that Petitioner is ineligible to have his sentence recalled and to be re-sentenced."

On September 10, 2021, the trial court denied the petition. Defendant filed a timely notice of appeal from the order.

## DISCUSSION

### I. Trial de novo

Defendant contends that the trial court erred by treating the evidentiary hearing as a trial de novo. He asserts that the parties should have been bound by the jury's prior verdict, and approaching the hearing as a trial de novo resulted in a violation of principles of collateral estoppel because the trial court opined that defendant could be guilty of first degree murder as well as second degree murder.

Defendant mischaracterizes the proceedings as a trial de novo, as the trial court relied on its review of the same evidence admitted at defendant's trial. Furthermore defendant remains convicted of second, not first degree murder. "'[I]t is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under section [1172.6], subdivision (d)(3).'" (*Ramirez, supra*, 71 Cal.App.5th at p. 984.)

11

Second degree implied malice murder was not eliminated by Senate Bill 1437.  (*People v. Gentile* (2020) 10 Cal.5th 830, 850.)  "'Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 410, quoting *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)  We thus begin with the presumption that the trial court correctly found that defendant remained guilty of second degree murder.  Defendant disagrees, asserting that the jury returned a verdict of not guilty as to first degree murder and that verdict binds the parties and the court.

Defendant makes this claim although the only verdict returned by the jury was a general verdict of murder of the second degree.  Such a verdict "shows only that the jury had a reasonable doubt as to his guilt on the degree of the murder [and] does not amount to a factual finding that appellant did not premeditate or deliberate the killing."  (*People v. Prock* (2014) 225 Cal.App.4th 812, 818.)  Moreover, it does not "establish that any or all of the specific elements of the offense are not true[, and] unless specific findings are made, 'the jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict . . . .'"  (*In re Coley* (2012) 55 Cal.4th 524, 554, citations omitted, quoting *United States v. Watts* (1997) 519 U.S. 148, 155; see *People v. Prock*, at pp. 818-819.)

In denying the petition, the trial court ruled that the prosecution had proven beyond a reasonable doubt the elements of first or second degree murder.  Defendant recognizes that second degree murder can be committed in several ways.  In addition to the natural and probable consequences doctrine,

defendant's jury was instructed with second degree murder as follows: CALJIC No. 8.30, unpremeditated express malice murder; and CALJIC No. 8.31, implied malice murder. Thus, the court's opinion that the evidence also supported first degree murder does not affect the issue here as the court ruled in essence, that defendant remained guilty of second degree murder as defined under the 2019 amendments to sections 188 and 189. "Our task is to review the trial court's *ruling*, not its reasoning." (*People v. Turner* (2020) 10 Cal.5th 786, 807.)

Arguing that second degree murder can be committed only with an unpremeditated intent to kill or with implied malice, defendant insists that the trial court's finding that the evidence showed planning meant that the court found premeditation, which is inconsistent with unpremeditated second degree murder. Defendant concludes that because premeditation and implied malice are mutually exclusive, his trial jury and the court reviewing his petition "simply got it wrong."[5] We disagree. The trial court found it was most probably defendant who remained in the car and was thus not the actual killer. Defendant's arguments appear to suggest that one cannot aid and abet an implied malice murder, particularly with evidence of premeditation. However, aiding and abetting an implied malice murder is a valid theory of culpability for second degree murder.

---

[5] Defendant relies on *People v. Swain* (1996) 12 Cal.4th 593. In that case, the California Supreme Court held that it was error to instruct the jury on the contradictory principles of implied malice second degree murder in connection with conspiracy to commit murder. (*Id*. at pp. 602-603, 607.) Defendant was not charged with conspiracy, and we found no conspiracy instructions in the trial record.

13

(*People v. Gentile, supra*, 10 Cal.5th at p. 850.) Implied malice murder is committed "'when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*Ibid.*)

   As the trial court commented, it is possible that defendant thought that only a beating was planned when he drove his codefendants to the remote location. Without aggravating circumstances, a beating with fists is ordinarily not considered life-endangering conduct. (*People v. Cravens, supra*, 53 Cal.4th at p. 508.) However, a conscious indifference to human life may be inferred where a defendant who may have intended only to assault the victim with his fists or even just to argue with the victim, first arms himself with a deadly weapon. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107-110, citing *People v. Rosenkrantz* (1988) 198 Cal.App.3d 1187 [see pp. 1191-1192, 1203-1204], *In re Russell H.* (1987) 196 Cal.App.3d 916 [see pp. 918-920], *People v. Summers* (1983) 147 Cal.App.3d 180 [see pp. 184-185] & *People v. Love* (1980) 111 Cal.App.3d 98 [see pp. 107-108].) Thus in this case, Valdez may have intended only to argue with the victim or to beat him, but malice may be implied from his retrieval of the murder weapon just before defendant drove him, Mejico and Imperial to the remote location.

   To be liable for an implied malice murder as a direct aider and abettor, defendant must have, "by words or conduct, aid[ed] the commission of the life-endangering *act* [with] knowledge that

14

the *act* is dangerous to human life, and acting in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712-713, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1122.) "Though [Senate Bill 1437] abolished the natural and probable consequences doctrine, it maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged. (§ 188.)" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*).) "Therefore, notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*People v. Gentile, supra*, 10 Cal.5th at p. 850.)

We conclude from these authorities that where, as here, the evidence shows that the direct perpetrator harbored implied malice, that is, he armed himself with a firearm in conscious disregard of the danger to the victim, the person who aids and abets a planned assault knowing that the perpetrator is armed may be found to have shared the perpetrator's conscious disregard for the victim's life and is therefore guilty of implied malice murder, regardless of the trial court's opinion that the evidence also supports first degree murder.

## II.     **Standard of review**

Defendant acknowledges that in general the trial court's ruling is reviewed for substantial evidence but argues that, here, we should undertake an independent or de novo review of the trial evidence to determine whether the prosecution met its burden of proof. Relying on *People v. Vivar* (2021) 11 Cal.5th 510

15

(*Vivar*), defendant contends that, because the trial court's factual determinations were based solely on the "cold record" with no live testimony, this court should conduct an independent review, without giving deference to the trial court's findings as is usual in a substantial evidence review. Defendant concludes that with no witnesses to observe, the court had no occasion for the court to make any credibility determinations.

We disagree. *Vivar* is an inapt comparison as it did not involve section 1172.6, but a ruling on whether there had been a sufficient showing of prejudice to vacate a conviction by those facing negative immigration consequences, and presented issues that "while mixed questions, are predominantly questions of law." (*Vivar, supra*, 11 Cal.5th at pp. 517, 524.) Like the defendant in *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591, which rejected a similar argument, defendant "ignores *Vivar's* footnote 7 [at p. 528], which expressly cautioned against extensions of the type [he] urges."

A similar argument in reliance on *Vivar* was also rejected in *Clements, supra*, 75 Cal.App.5th at page 302, which noted that "the Supreme Court emphasized in *Vivar* that the 'embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence.' (*Vivar, supra*, 11 Cal.5th at p. 527.) The same factors don't support applying independent review in the context of reviewing a trial judge's ruling after a full hearing under section [1172.6,] subdivision (d)(3)."

16

*Clements* held that the better comparison is found in *People v. Perez* (2018) 4 Cal.5th 1055, in which "our Supreme Court . . . held in the context of a Proposition 36 petition for recall of sentence that 'even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings.'" (*Clements, supra*, 75 Cal.App.5th at p. 302, quoting *People v. Perez*, at p. 1066; accord, *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233; *People v. Mitchell, supra*, 81 Cal.App.5th at p. 591; *People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090.) We agree with these authorities that "[t]he proper standard of review thus defers to the trial court's factfinding[, and] [w]e review the trial court's findings for substantial evidence." (*People v. Mitchell*, at p. 591.)

That being said, we note that defendant does not contend the trial court's determination is unsupported by substantial evidence. As it is defendant's burden to demonstrate the determination was unsupported by substantial evidence but makes no attempt to do so, we presume the evidence was sufficient. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)

## III. Standard of proof

Defendant contends the trial court failed to hold the prosecution to its burden to prove beyond a reasonable doubt that the petitioner committed murder pursuant to a theory of the case that remains valid under current law. "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted

17

murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

Defendant bases his contention that the court did not comply with this requirement on comments made under the heading "Legal Principles" in the memorandum of decision. The court's statement of the underlying legal principles showed an understanding of the prosecution's burden. The court noted the prosecution had "the burden 'to prove, beyond a reasonable doubt, that the petitioner [was] ineligible for resentencing,'" by disproving at least one of the conditions to eligibility listed in section 1172.6, subdivision (a), including subdivision (a)(3). The court explained that subdivision (a)(3) states the petitioner is eligible if he could not presently be "convicted of first or second-degree murder because of changes to Section 188 or 189 made effective January 1, 2019." The trial court then observed, "[t]he prosecutor must prove beyond a reasonable doubt each element of first or second-degree murder under current law . . . ."

While defendant does not disagree with the above quoted statement, he takes issue with the court's comments that followed. The court stated: "The prosecutor's burden is to prove that the state *would* be able to prove the petitioner's guilt of first or second-degree murder under current law. In that context, 'would' expresses 'a possibility or likelihood'—namely, the possibility or likelihood that the state can prove the petitioner's guilt of first or second-degree murder under current law. [¶] It is the court's responsibility to act as independent factfinder and determine whether the evidence establishes a petitioner *would* be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing . . . ."

18

Defendant calls the comments a "confusing mish-mash of different standards." He construes them as ruling that the prosecutor was required only to show that there was a possibility that defendant was ineligible for relief While the court's explanation may be ambiguous, we do not agree that any ambiguity is susceptible to defendant's suggestion that it must be resolved by concluding that the trial court applied a lower standard of proof than the reasonable doubt standard required by section 1172.6. "If a judgment or order is ambiguous, it is subject to construction by a reviewing court." (*Yarrow v. State of California* (1960) 53 Cal.2d 427, 436.) The trial court sufficiently clarified the procedure it followed under the memorandum's "Legal Principles" not only by stating that "[t]he prosecutor must prove beyond a reasonable doubt each element of first or second-degree murder under the current law . . . ," but also by noting the prosecution bore the burden "to prove, beyond a reasonable doubt, that the petitioner [was] ineligible" because he could still be convicted of murder under section 188 or 189 as amended effective January 1, 2019. The court thus required the prosecution to prove that the trial evidence established beyond a reasonable doubt that defendant remains guilty of murder under current law.

Defendant refers only to the ambiguous comments under "Legal Principles" as the court's ruling, but it was not. The ruling appears under the heading "Disposition" as follows: "For the foregoing reasons, the court finds that the prosecution has proven each element of first or second-degree murder beyond a reasonable doubt and that Petitioner is ineligible to have his sentence recalled and to be re-sentenced." As previously explained, we "review the trial court's *ruling*, not its reasoning."

19

(*People v. Turner, supra*, 10 Cal.5th at p. 807.)  Also, the trial court's opinion that the evidence also proved first degree murder beyond a reasonable doubt does not negate the ruling that defendant remains guilty of second degree murder.

## DISPOSITION

The order denying the petition is affirmed.

_____
CHAVEZ, Acting P. J.

We concur:


_____
HOFFSTADT, J.


_____
BENKE, J.*

---

\*      Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.