73 Cal.Rptr.3d 522 (2008)
160 Cal.App.4th 1441
The PEOPLE, Plaintiff and Respondent,
v.
Reyas CONCHA and Julio Hernandez, Defendants and Appellants.
No. B195197.
Court of Appeal of California, Second District, Division Five.
March 18, 2008.
*524 Maria Morrison, under appointment by the Court of Appeal, Los Angeles, for Defendant and Appellant, Reyas Concha.
Diana M. Teran, under appointment by the Court of Appeal, Los Angeles, for Defendant and Appellant, Julio Hernandez.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.
Certified For Partial Publication.[*]
*523 MOSK, J.

INTRODUCTION
The defendants, along with two accomplices, threatened to kill, attacked, beat, and stabbed the victim. The victim drew a pocket knife and in defending himself stabbed one of the accomplices to death. The defendants were convicted of first degree murder of the deceased accomplice *525 under the provocative act theory and of the attempted first degree murder of the victim. In the published portion of the opinion, we hold that there was substantial evidence to support the conviction for murder based on the provocative act theory; that the first degree murder conviction is supported by the jury's finding that the attempted murder of the victim was deliberate and premeditated; that the trial court's instruction on the provocative act theory did not constitute prejudicial error; and that the trial court did not err in excluding evidence of one of the defendant's blood alcohol level and in not instructing the jury on voluntary intoxication. In the unpublished portion of the opinion, we deal with evidentiary and sentencing issues.

FACTUAL STATEMENT
Jimmy Lee Harris owned the Cindy Lu Beauty Salon located at 4411 South Normandie Avenue, at the corner of Vernon Avenue. At approximately 11:40 p.m. on July 14, 2005, Harris returned to his place of business from dinner. He parked his car in the alley abutting the parking lot behind the business. As Harris opened the driver's door of his car and attempted to exit, two men approached him. When Harris stood up, one of the men was just inches from him and the other was standing next to the open car door. Harris saw that they were male Hispanics with shaved heads.[1] Harris identified Julio Hernandez as the man closest to him and Reyas Concha as the other man. Concha said "Give up the money, Holmes, [sic] or we're gonna kill you[,] and the smokes." He also said something to the effect of "46 Crips." Harris replied that he did not have any "smokes." Concha repeated the demand for money and the threat to kill him if Harris did not acquiesce.
Harris realized he had "a problem with these guys because those two [Hernandez and Concha] [were] closest and there [were] two more [male Hispanics] maybe eight to ten feet from [him]...." Harris's "main objective was to try to get out of there...." Harris[2] grabbed Concha, pulled him into Hernandez, and attempted to flee, but he encountered the other two male Hispanics. All four male Hispanics attacked Harris in the alley. Harris "fought them off in the alley where they [were] doing a lot of hitting on [him]. And [he] got away from them, and ... ran into ... Normandie Avenue."
When Harris ran into Normandie, he thought perhaps his attackers would not follow, but they did. He ran south down the middle of Normandie, and his attackers pursued him for over a quarter of a mile. Kevin Decoud was near the laundry room of his apartment building on Normandie, smoking a cigarette, when he heard someone cry for help. He went to the gate and saw Harris "zigzagging across [Normandie] ... hollering for help, trying to get help on his cell phone while three Mexican guys chased him." Harris was running "pretty fast," but was tiring. One of the Hispanic men, whom Decoud identified as Hernandez, was ahead of the other two. The male Hispanics were spaced about five seconds apart. The second one appeared to be holding a brown beer bottle. Sometime later, Decoud observed Hernandez running back down Normandie in the opposite direction holding his side.
Harris ran up to a man and a woman walking south on Normandie and told them that his pursuers were trying to kill *526 him, but that man and woman ran off in a different direction. He ran up to another man at about 48th Street, said the same thing to him, and asked him to call 911, but that man ran off as well.[3] Harris then went to a house on the south side of 48th Street and knocked on the door, but no one answered.
Harris's pursuers were now "closing in on [him] real good," so he ran from the porch and attempted to scale a five foot fence on the side of the house, but was too tired. His pursuers caught up to him, pulled him off the gate, and began stabbing him in the back. They were stabbing him for "some seconds when [he] thought about ... that little pocket knife in [his] pocket." When he reached the knife, he "knew that ... it was time to use it." He turned to face his attackers, and saw all "four" of the male Hispanics confronting him. Harris could not see what they were using to stab and hit him.[4] Harris, who felt he had no option, with his pocket knife "began to stab as many of [the male Hispanic assailants] as he could; ... [he] was fighting for his life." The altercation "went on for awhile" and then Harris "saw ah opening and ... ran out of there ... to another house," approximately three houses down 48th Street. As he ran from the side of the first house, he encountered Concha who said, "Holmes [sic ] why did you stab me?" Harris "hit [Concha] up under the chin, [or] on the neck...."
Harris ran to a second house, beat on the door, and eventually an African-American man and his girlfriend came out. Harris asked them to call 911 because "physically [he] was in bad shape, and mentally as well.... [He] just wanted to get some help from the police...." He was "bleeding profusely all over." The man who answered the door had a gun in his hand and told Harris "to step off the porch." Harris told the couple at the second house, "four Mexican guys are trying to kill me."
The man and woman who answered the door at the second house were Dalvin Cooper and Taneica Talbert. Cooper observed that there was blood all over his porch. Harris kept repeating the same things, "Please call the police. They're trying to kill me. Please, please, sir, call the police. They're trying to kill me." Harris "had a very scared look on his face." Cooper observed that Harris had "[a] lot of cuts on his hands [and] arms ... [and] a big cut like almost behind his ear. He was bleeding from the head area ... [and had c]uts almost everywhere." Cooper did not see anyone else on the street, but Talbert looked down the street and saw two men standing by the stop sign. She also observed that Harris "[l]ooked scared for his life." Cooper called the police.
Once Cooper and Talbert answered the door, Harris did not see what became of his four assailants. Eventually, the police arrived at the scene, and Harris told them what had happened. The paramedics arrived and began to treat Harris's wounds. They transported him to California Hospital Medical Center.
Harris sustained an injury to his collar bone and suffered wounds to his left shoulder that required stitches, to his side and back, to his stomach, to his chest, to his upper right shoulder that required stitches, to his back that required stitches, *527 to the right side of his neck, to his head behind his right ear, to his right temple that required stitches, to the left side of his head behind his left ear that required stitches, to his right arm, and to his finger. He received a total of about 60 stitches, and had residual injuries from blows to his head that caused him to be extremely light sensitive and that required him to return to the hospital for an overnight stay.
Harris positively identified Concha from a six-pack photographic line-up, but could not identify Hernandez from a photographic line-up. At the preliminary hearing and at trial, however, he identified both defendants as two of the men who confronted, threatened, and attacked him. Decoud also positively identified Hernandez as one of the three male Hispanics that chased Harris down Normandie and as the one he saw returning, holding his side.
On that same evening, Gabriel Estrada was employed as a security guard outside the emergency room of the California Hospital Medical Center. Paramedics came to Estrada and informed him that there was a man in the parking lot bleeding who needed help. Estrada contacted nurses and doctors, and they ran out to the parking lot with a gurney. Estrada observed a male Hispanic lying on the ground (presumably Sanchez) and three other males standing over him. One of the three men standing over Sanchez said, "He need[s] help. He's bleeding." Estrada asked what happened, and the man replied, "He's just bleeding. He was stabbed real bad and needs ... help." The man with whom Estrada spoke was a Hispanic male with no shirt and tattoos on his chest. That man (presumably Concha) informed Estrada that he "was stabbed too ...", and asked Estrada whether he "should go in?" Estrada replied, "Come in. We can help you out," but the man just sat there and said again "Should I go in?" Estrada said, "yeah, we can help you out;" but the injured man refused to enter the hospital.
The other two male Hispanics told the man trying to help Sanchez to get in a van, and the man complied. The van was a white, older model vehicle. As the van left the emergency room parking lot, Estrada wrote down the license number and gave it to the police. About 45 minutes to an hour after the van left, Estrada again saw the injured man who had refused help. Concha returned to the emergency room in a rescue ambulance with a stab wound to his neck or chest. He and his two companions had shaved heads. Estrada reviewed a security videotape of the emergency room ambulance bay from that night and was able to identify himself depicted on the video running out of the emergency room with a flashlight and speaking with three individuals, who then walked away from him.
Hernandez admitted in a taped interview with police that he took his cousin, Sanchez, to the hospital after Sanchez and Hernandez fought with "some Black fool," and that he learned the next day that Sanchez had died. Dr. Ajay Panchal, a Deputy Medical Examiner for the Los Angeles County Coroner's Office, conducted an autopsy on Sanchez to determine the manner and cause of death. Sanchez had sustained a total of six stab wounds, including fatal wounds to the heart and lung. Dr. Panchal did not determine the time of death, but he was aware that Sanchez had been admitted to the hospital and subsequently pronounced dead. He was also aware of life-saving measures performed on Sanchez at the hospital.
The morning after the attack on Harris, Los Angeles Police Officer Alberto Rosa arrived at the fight scene1340 West 48th Street, the house closest to Normandie. He observed blood on the west wall of the *528 residence, and a broken window near the blood on the wall. He also saw blood on the sidewalk in front of the residence. In the side yard of the residence, Officer Rosa recovered several items of evidence in close proximity to one another, including a "can opener," a lighter, a broken "top" of a Pacifico beer bottle, and a "rubber tip" of a can opener that appeared to belong to the can opener he recovered. Rosa also recovered a broken Pacifico beer bottle on the ledge of a public pay phone on the corner of 48th Street and Normandie.[5]
At Concha's residence, Officer Rosa located bloody clothing on the floor. Outside Concha's residence in the rear alley, Officer Rosa located a white van with the same license plate number as the one provided to police by Estrada. Inside the van, Officer Rosa found bloody clothing and Sanchez's driver's license, which was inside a checkbook on the floor near the driver's seat. Officer Rosa observed blood on the right rear passenger or sliding cargo door, in the area of the driver's seat, on the outside of the driver's door, on the front passenger seat of the vehicle, on the steering wheel, on the rear middle passenger bench, and on the interior rear passenger door of the van.
Surrounding the van, Officer Rosa found two bottles of Pacifico beer to the rear of the van, a black and orange "beanie," a white t-shirt hung over a wooden fence, and a Pacifico beer bottle at the front of the van. About 22 feet from the van, Officer Rosa located another Pacifico beer bottle and a toy gun with an orange tip.
In his tape recorded interview with police, Hernandez admitted that on the day of the incident, he and his cousin, Sanchez, began drinking beer at Hernandez's house about 7:30 p.m. By around 10:30 p.m., they were drinking in the alley around 45th Street and Normandie. Hernandez had a beer in his hand, "some kind of black ... Pacifico beer...." "[S]ome black fool.... and some other fools were walking." Then, "this black fool kind of get crazy." Hernandez "started running behind them." They "ran all the way to 48[th Street] and Normandie." Hernandez recalled running with a beer in his hand. At "48[th Street] and Normandie[,] [Hernandez] could see [Sanchez]." "They were fighting [Harris]...." [¶] So "[Hernandez] got involved [be]cause [he saw] his cousin right there." "[Hernandez] threw a bottle at him [Harris] [be]cause [he] wanted ... [to] get [Harris] off [Sanchez]." Hernandez also threw a can opener. "When he [Harris] turn[ed] around[,] he [struck] [Hernandez].... [I]t was dark and [Hernandez] did not know that he [Harris] had a knife or whatever it was. And then he [Harris] [struck] Hernandez." "[Sanchez] ran to the corner ... [¶] ... of Normandie and 48[th Street]." "[Sanchez] was dying on [Hernandez] and [Hernandez] gave him mouth to mouth [but Sanchez] didn't want to wake up ... [Hernandez tried] waking him up."
According to Concha's taped interview with police, he "got into a little argument with some black guy ... probably like [around] ... [¶] Normandie and Vermont [presumably Vernon]." "[He] was close to his house." Concha identified a photograph of his cousin "Max" [presumably Sanchez]. When asked if "you guys got into an argument ... [w]ith some black guy driving a car?" Concha replied, "I don't know if he was driving or not. I just remember the one that was fighting and *529 then ... I got out [of the car] to help him fight."
Concha admitted that the white mini-van located by police behind Concha's house belonged to him. Concha dropped Sanchez off at the hospital and he "went home." And he remembered that when he "got home [he] start[ed] passing out or something ... [¶] ... [he had lost] a lot of blood."
On the evening of the incident, Hernandez's younger brother, Anthony, observed his cousin, Sanchez, arrive at their house around 6 or 7 p.m. Sanchez and Hernandez were "very close." Sanchez brought beer with him, and he and Hernandez were drinking in the living room. Concha arrived, but when Hernandez's mother discovered Concha's arrival, she "kicked [the three men] out" at about 8 or 9 p.m.

PROCEDURAL BACKGROUND
The Los Angeles County District Attorney filed an information charging Hernandez and Concha in Count 1 with the murder of Sanchez, in violation of Penal Code section 187, subdivision (a);[6] in Count 2 with the attempted murder of Harris, in violation of sections 664 and 187, subdivision (a); and in Count 3 with attempted second-degree robbery, in violation of sections 664 and 211. As to Count 2, the information alleged that the attempted murder of Harris was committed willfully, deliberately, and with premeditation within the meaning of section 664, subdivision (a). The information further alleged as to each count that Concha and Hernandez personally used deadly and dangerous weapons within the meaning of section 12022, subdivision (b)(1). With respect to Hernandez, the information also alleged that he had suffered a prior conviction of a serious or violent felony within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i) as to each count (Three Strikes law).
Concha and Hernandez pleaded not guilty and denied the special allegations. The matter proceeded to a jury trial during which the prosecution dismissed the deadly and dangerous weapon allegation as to Concha only. The jury found Concha and Hernandez guilty of murder and attempted murder; found the deadly and dangerous weapon allegation true as to Hernandez; and found that the attempted murder of Harris was committed willfully, deliberately, and with premeditation. The jury deadlocked on the robbery charge as to each defendant, and the trial court granted the prosecution's motion to dismiss that count. Hernandez admitted that he had suffered a prior conviction of a serious or violent felony within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i).
The trial court sentenced Concha to 25 years to life on Count 1the murder convictionand 15 years to life on Count 2 the attempted murder convictionto run consecutively, for an aggregate sentence of 40 years to life. The trial court sentenced Hernandez to 25 years to life on Count 1, doubled to 50 years based on the prior strike conviction; an additional consecutive one year sentence based on the section 12022, subdivision (b)(2) deadly weapon enhancement allegation; and 15 years to life on Count 2, doubled to 30 years based on the prior strike conviction, to run consecutively, for an aggregate sentence of 81 years to life.

DISCUSSION

A. Standards of Review
Defendants' contention that there was insufficient evidence to support *530 their convictions for the murder of Sanchez is reviewed under a substantial evidence standard. "When reviewing a claim of insufficiency of evidence, we must view the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from that evidence. The test is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. We must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proof beyond a reasonable doubt of each essential element of the offense. Substantial evidence must be of ponderable legal significance, reasonable in nature, credible and of solid value. (People v. Cervantes [(2001).] 26 Cal.4th [860,] 866[, 111 Cal. Rptr.2d 148, 29 P.3d 225]; People v. Caldwell [(1984)] 36 Cal.3d [210,] 217[, 203 Cal.Rptr. 433, 681 P.2d 274]; People v. Kainzrants [(1996)] 45 Cal.App.4th [1068,] 1076[, 53 Cal.Rptr.2d 207].)" (People v. Briscoe (2001) 92 Cal.App.4th 568, 584-585,112 Cal.Rptr.2d 401.)
The trial court's rulings on the exclusion of Concha's blood alcohol level and the admission of the photographs showing certain of his tattoos are reviewed under an abuse of discretion standard of review. (See People v. Avila (2006) 38 Cal.4th 491, 578, 43 Cal.Rptr.3d 1, 133 P.3d 1076 ["We review for abuse of discretion a trial court's rulings on relevance and the exclusion of evidence under Evidence Code section 352"].) "The standard of review for a claim of instructional error of this kind is de novo: the question is one of law, involving as it does the determination of the applicable legal principles (see People v. Louis (1986) 42 Cal.3d 969, 985 [232 Cal.Rptr. 110, 728 P.2d 180])." (People v. Berryman (1993) 6 Cal.4th 1048, 1089, 25 Cal.Rptr.2d 867, 864 P.2d 40.)

B. Sufficient Evidence of Provocative Act
"The classic statement of the elements of the `provocative act' murder is found in People v. Gilbert (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds (1967) 388 U.S. 263[, 87 S.Ct. 1951, 18 L.Ed.2d 1178]: `When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life, [¶] Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice. [Citations omitted.]' ([People v. Gilbert, supra,] 63 Cal.2d at pp. 704-705[, 47 Cal.Rptr. 909, 408 P.2d 365].)" (In Re Aurelio R. (1985) 167 Cal.App.3d 52, 58, 212 Cal.Rptr. 868; see also People v. Washington (1965) 62 Cal.2d 777, 782, 44 Cal.Rptr. 442, 402 P.2d 130; People v. Karapetyan (2003) 106 Cal. App.4th 609, 619, 130 Cal.Rptr.2d 849.)
"Because the provocative act murder theory was derived in the context of felony-murder factual scenarios (usually robberies) and was specifically conceived as a caveat to the felony-murder rule, confusion can be avoided if use of the term provocative act murder is reserved for that category of intervening-act causation cases *531 in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into shooting back, resulting in someone's death." (People v. Cervantes (2001) 26 Cal.4th 860, 872-873, fn. 15, 111 Cal.Rptr.2d 148, 29 P.3d 225.) The provocative act doctrine is not limited to firearm situations. (People v. Lima (2004) 118 Cal.App.4th 259, 268, 12 Cal.Rptr.3d 815 ["while provocative act murder has traditionally involved cases where the defendant instigates a gun battle, it is not by definition limited to such factual situations. Neither its elements nor any case law interpreting this doctrine support such a limitation"].) "`[M]ere participation in an armed robbery is not sufficient to invoke murder liability, direct or vicarious, when the victim resists and kills.' (In re Joe R. (1980) 27 Cal.3d 496, 504 [165 Cal.Rptr. 837, 612 P.2d 927].) The life-threatening acts must be other than those implicit in the crime of armed robbery. (Id. at p. 503[, 165 Cal.Rptr. 837, 612 P.2d 927].)" (People v. Garcia (1999) 69 Cal.App.4th 1324, 1329, 82 Cal.Rptr.2d 254.) When, as here, however, the underlying felony is attempted murder, it is not necessary that the provocative act be independent of that underlying felony, as is the case when the underlying felony does not involve an intent to kill, such as in robbery. (In re Aurelio R., supra, 167 Cal.App.3d at pp. 59-60, 212 Cal.Rptr. 868; People v. Gallegos (1997) 54 Cal.App.4th 453, 461-462, 63 Cal.Rptr.2d 382.)
Defendants contend that the provocative act doctrine does not apply because there was insufficient evidence that they engaged in any life-threatening conduct involving a high probability that it would evoke a lethal response from Harris. According to defendants, the evidence showed only that they may have fought with Harris, and such conduct is insufficient to result in liability for Sanchez's death under the provocative act theory of murder.
The evidence showed that Hernandez and Concha confronted Harris as he attempted to exit his car, and Concha twice threatened to kill him if he did not relinquish money, which he did not do. Those threats prompted Harris to fight with the two men and their two accomplices. Outnumbered, Harris broke free from his assailants and hoped that they would not pursue him. But the assailants, led by Hernandez, chased Harris for over a quarter of a mile. During the chase, Harris asked at least three people for help, telling them that his pursuers were trying to kill him. In desperation, Harris pounded on the door of a house, pleading for help, and, when no one responded, he attempted to scale a fence at the side of the house. The assailants cornered Harris at the fence and began to stab and beat him. The number and type of Harris's wounds suggest that at the fence he was viciously assaulted, sustaining, inter alia, severe wounds to his head and neck. Trapped and in fear for his life, Harris began to stab as many of his assailants as he could. That both Hernandez and Concha received stab wounds confirms they were actively engaged in the assault by the fence.
Based on the evidence, the jury could have reasonably concluded that the conduct of Hernandez and Concha in threatening to kill Harris, relentlessly pursuing him, and assaulting him by the fence constituted intentional acts that they knew were likely to cause death and had a high probability of evoking a response from Harris that could be lethal. (People v. Briscoe, supra, 92 Cal.App.4th at p. 582, 112 Cal.Rptr.2d 401.) Therefore, there was substantial evidence that both defendants committed the requisite provocative *532 acts to sustain the jury's finding of liability for the killing of Sanchez.
The focus is on the probability that the defendant's provocative act will evoke a lethal response of some kind. Neither the "elements of the theory nor the case law interpreting it require that the provocative act provoke any specific kind of lethal response. As long as the act carries with it a high probability of provoking a lethal response, it satisfies the requirements of the theory.
Although defendants may not have known whether Harris had a knife or other weapon, there was substantial evidence that their conduct instilled in him an extreme fear for his life, making it likely and foreseeable that he would respond in a potentially lethal manner in order to save his own life. He was substantially larger than his assailants. Whether he used his size advantage or pulled a knife or grabbed a bottle or any other potential weapon that may have been at hand, there was substantial evidence that it was highly probable that defendants' life-threatening conduct would provoke some such self-defensive action on his part.

C. Provocative Act Jury Instruction
Defendants contend that the trial court committed prejudicial error in instructing the jury on the provocative act theory of murder because, as defendants read it, that instruction fails to distinguish between a surviving accomplice, i.e. Hernandez and Concha, and a deceased one, i.e. Sanchez. Defendants argue that the failure to make that distinction allowed the jury to find them liable for Sanchez's killing based solely on Sanchez's own provocative acts towards Harris.
After the prosecution rested, the prosecutor submitted an instruction on the provocative act theory, as applied to a defendant who is the provocateur and as applied to an accomplice of a provocateur. (See People v. Garcia, supra, 69 Cal.App.4th at p. 1331, 82 Cal.Rptr.2d 254.) After reviewing the instruction with counsel for the parties, the trial court approved it.[7] *533 The trial court stated that the prosecution's proposed instruction would be given in lieu of CALCRIM Nos. 560 and 561. The prosecution also proposed a special verdict form on which the jury would indicate whether it was "finding each defendant guilty [of murder under the provocative act doctrine] based on their personally committing a provocative act or aiding and abetting another in committing a provocative act." The trial court and counsel for each defendant agreed that the prosecution should submit such a special verdict form. The jury thereafter returned verdicts that each defendant personally committed provocative acts.
Defendants argue that the trial court's instruction deviates from CALCRIM Nos. 560 and 561 in at least two material and prejudicial respects. First, in using the term accomplice, the instruction fails to distinguish between a surviving accomplice and a deceased accomplice. Second, CALCRIM No. 561, in describing the provocative act theory of murder as it relates to an accomplice of the provocateur, has blanks for the name of the alleged provocateur, whereas the trial court's instruction] merely referred to an accomplice, without more. Defendants focus on these perceived differences between CALCRIM Nos. 560 and 561, on the one hand, and the trial court's instruction, on the other, and argue that the trial court's instruction was contrary to established law because it allowed the jury to find defendants liable for the murder of Sanchez based on Sanchez's own provocative act or acts and not the acts of defendants.
"In assessing whether the jury instructions given were erroneous, the reviewing court `"must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' (People v. Martin (2000) 78 Cal.App.4th 1107, 1111 [93 Cal.Rptr.2d 433]; [citations].)" (People v. Guerra (2006) 37 Cal.4th 1067, 1148-1149, 40 Cal.Rptr.3d 118, 129 P.3d 321.) When the trial court's instruction on the provocative act theory is read in its entirety, it does not suffer from the deficiencies that defendants perceive. The trial court's instruction expressly informed the jury that if Sanchez's own provocative *534 act towards Harris was the sole cause of Sanchez's death, the defendants could not be held liable for his murder. This was a correct statement of the law. "[T]he courts have stated repeatedly that to prove the provocative act theory it must be shown that the defendant or a surviving accomplice committed a life-threatening act beyond that necessary to commit the robbery. [Citation.] Although this component refers to a surviving accomplice, the reference is meant to exclude liability when the deceased provocateur accomplice is the sole cause of his death and is the accomplice whom defendant is charged with murdering." (People v. Garcia, supra, 69 Cal.App.4th at p. 1331, 82 Cal. Rptr.2d 254.)
That Sanchez may have committed provocative acts that, in part, were the cause of Harris's lethal response would not prevent the jury from finding Hernandez and Concha liable for his murder based on their own independent provocative acts. "`In People v. Caldwell (1984) 36 [Cal.]3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], the deceased and his two accomplices all committed provocative acts which thereafter led to the killing of the deceased perpetrator by police. Caldwell held that the two accomplices could be vicariously liable for the deceased's death even though the deceased's provocative acts contributed in part to his own death. Thus, the fact that the decedant's [sic] provocative act was a partial cause of his own death would not bar the accomplices' liability for murder if their provocative acts were a "substantial factor" which contributed to the ultimate result. [Citation.]'" (People v. Garcia, supra, 69 Cal.App.4th at p. 1332, 82 Cal. Rptr.2d 254.)
Based on the authorities, Hernandez and Concha can be found responsible even though Sanchez's own provocative act could have been a partial cause of his death, so long as the acts of either Hernandez and Concha were a substantial factor in Harris's stabbing of Sanchez. The trial court's instruction stated exactly that by providing: "In order to prove that Max Sanchez's death was the natural and probable consequence of the defendants' or an accomplice's provocative act, the People must prove: [¶] ... [¶] 2. The defendant's or accomplice's act was a direct and substantial factor in causing Max Sanchez's death. AND [¶] 3. Max Sanchez's death would not have happened if defendant has not committed a provocative act. [¶] A substantial factor is more that [sic] a trivial or remote factor. However, it does not need to be the only factor that caused death." (Italics added.) Defendants claim this instruction relates to proximate cause and not intent. In the special verdict form, the jury unequivocally found that each defendant had personally committed a provocative act. The challenged instruction properly defined a provocative act as "an act whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response...." The jury's finding that each defendant engaged in a provocative act, when read together with the definition of a provocative act, demonstrates that the jury did not rely on Sanchez's acts, but rather upon the individual actions of Hernandez and Concha.
In light of the facts, the jury's express findings on the verdict form, and the relevant portions of the challenged instruction, there was not a reasonable probability that the jury found defendants liable for Sanchez's murder based solely on Sanchez's provocative acts. (See People v. Guerra, supra, 37 Cal.4th at p. 1148, 40 Cal. Rptr.3d 118,129 P.3d 321.)

D. First or Second Degree Murder
Defendants contend that the trial court's instruction concerning whether the murder *535 of Sanchez was first or second degree was an incorrect statement of the law that prejudicially affected the verdicts. According to defendants, by permitting the jury to make a finding of first degree murder if it concluded that Sanchez was killed during an attempted murder, the instruction misstated the law applicable to a finding of first degree murder. We disagree.
Murder requires "malice aforethought." (§ 187, subd. (a).) Malice may be either express or implied. (§ 188.) Express malice requires "a deliberate intention unlawfully to take away the life of a fellow creature." (Ibid.) A willful, deliberate, and premeditated killing is murder of the first degree. (§ 189.) "[T]he mental state comprising malice is independent of that encompassed within the concepts of willfulness, deliberation, and premeditation." (People v. Nieto Benitez (1992) 4 Cal.4th 91, 103, 13 Cal.Rptr.2d 864, 840 P.2d 969.)
Here, defendants were prosecuted for the murder of Sanchez under the provocative act theory. When a murder is committed under the provocative act theory, the degree of murder is determined under section 189. (See People v. Gilbert (1965) 63 Cal.2d 690, 705, 47 Cal.Rptr. 909, 408 P.2d 365.) That section, entitled "Degrees of Murder," provides in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree." (§ 189, italics added.)
Defendants argue that attempted murder is not one of the felonies enumerated in section 189 for which a defendant can be found liable for first degree murder. Therefore, according to defendants, section 189 required the trial court to instruct the jury that if the defendants were found liable for the murder of Sanchez under the provocative act theorybased on their attempted murder of Harristhe murder was of the second degree.
The portion of section 189 that lists various felonies, however, relates to first degree murder under the felony-murder rule, not the provocative act theory. Under the felony-murder rule, a defendant who did not have the specific intent to kill, i.e. did not act with express malice, is nevertheless guilty of first degree murder if he or she committed a killing during the commission of one of the felonies listed in section 189. (See People v. Robertson (2004) 34 Cal.4th 156, 165, 17 Cal.Rptr.3d 604, 95 P.3d 872 ["The felony-murder rule eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence or absence of actual malice, both with regard to first degree felony murder and second degree felony murder"].) Thus, under the felony-murder rule, the requisite malice for a finding of first degree murder is implied. The only intent required is the intent to commit the underlying felony that resulted in the killing by the defendant.
Defendants' focus on the felony-murder portion of section 189 is misplaced because, unlike the felonies that qualify under the felony-murder rule for first degree murder, the underlying felony here *536 was premeditated, attempted murdera crime that requires both express malice and premeditation. In finding defendants guilty of attempted first degree murder, the jury necessarily found that Hernandez and Concha had the specific intent to kill Harris, i.e., they acted with express malice, and expressly found that they acted with premeditation and deliberation. The jury also found that each defendant committed a provocative act in the course of the attempted murder of Harris that proximately caused the death of Sanchez. Therefore, as discussed below, under the doctrine of transferred intent, their malice, deliberation, and premeditation are transferred, by operation of law, to the killing of Sanchez.
As the Supreme Court has observed, "In the classic provocative act murder prosecution, malice is implied from the provocative act, and the resulting crime is murder in the second degree. (§§ 187, 188; 1 Witkin & Epstein, Cal.Criminal Law, supra, Crimes Against the Person, § 148, p. 762 et seq.; People v. Dellinger (1989) 49 Cal.3d 1212, 1221 [264 Cal.Rptr. 841, 783 P.2d 200].) But whether or not a defendant's unlawful conduct is `provocative' in the literal sense, when it proximately causes an intermediary to kill through a dependent intervening act, the defendant's liability for the homicide will be fixed in accordance with his criminal mens rea. If the defendant proximately causes a homicide through the acts of an intermediary and does so with malice and premeditation, his crime will be murder in the first degree (see § 189 [`All murder which is perpetrated ... by any ... kind of willful, deliberate, and premeditated killing ... is murder of the first degree.']; [People v.] Gilbert, supra, 63 Cal.2d at p. 705[, 47 Cal.Rptr. 909, 408 P.2d 365]), irrespective of whether his conduct, in a literal sense, provoked the intermediary into killing." (People v. Cervantes, supra, 26 Cal.4th at pp. 872-873, fn. 15, 111 Cal. Rptr.2d 148, 29 P.3d 225, italics added.)
The Supreme Court's discussion in People v. Sanchez (2001) 26 Cal.4th 834, 111 Cal.Rptr.2d 129, 29 P.3d 209, a transferred intent case, is also relevant to the first degree murder analysis. In that case, the defendant arid a rival gang member shot at each other, killing an innocent bystander with a stray bullet. The evidence did not establish which shooter killed the victim. The court held that the jury could reasonably have found that each shooter had premeditated and deliberated the attempted murder of the other, and thus the defendant could be convicted of first degree murder regardless of whether his bullet killed the bystander. The court said, "Although the actual shooting here may have been almost spontaneous, the mutual planning of one another's murder supports a finding of premeditation as to both defendant and [the rival gang member]. [Citation.] The requisite mental state for first degree murder (premeditation and malice) having thereby been proved, by operation of the doctrine of transferred intent, both defendant and [the rival gang member] became liable for first degree murder on the showing that the conduct of each was a proximate cause of [the bystander's] death." (Id at pp. 850-851, 111 Cal. Rptr.2d 129, 29 P.3d 209.)
The court in People v. Sanchez, supra, 26 Cal.4th 834, 111 Cal.Rptr.2d 129, 29 P.3d 209 explained the operation of the doctrine of transferred intent in the factual context of that case. "Defendant and [the rival gang member] engaged one another in a gun battle on a public street in broad daylight, during which each plainly attempted to murder the other. Given that their respective claims of self-defense were rejected by the jury, express malice on the part of each was patently established." *537 (Id. at p. 852, 111 Cal.Rptr.2d 129, 29 P.3d 209.) According to the court, "`For purposes of applying the rule of transferred intent, it does not matter whether defendant himself fired the fatal shot or instead induced or provoked another to do so; in either situation, defendant's culpable mental state is determined as if the person harmed were the person defendant meant to harm. [Citation.].'" (Id. at p. 851, fn. 9, 111 Cal.Rptr.2d 129, 29 P.3d 209.)
The Supreme Court's discussion of the doctrine of transferred intent in People v. Sanchez, supra, 26 Cal.4th 834, 111 Cal. Rptr.2d 129, 29 P.3d 209 included a factual scenario in which a defendant shoots at A with express malice and deliberation, causing A to return fire that unintentionally kills innocent bystander B. According to the court, the defendant in that scenario is liable for the first degree murder of B, notwithstanding his lack of intent to kill B. (Id. at p. 851, fn. 9, 111 Cal.Rptr.2d 129, 29 P.3d 209.) The only difference between that scenario and the instant case is that here the victim, Sanchez, was an accomplice of defendants, not an innocent bystander. But, under the doctrine of transferred intent as discussed in People v. Sanchez, the status of the victim as an innocent bystander or as an accomplice should not be a distinguishing factor because in each situation the victim's death was not intended by the defendant.
In this case, as in the factual scenario set forth above, it is undisputed that defendants did not intend to kill their accomplice Sanchez; they intended to kill Harris and, in attempting to do so, they provoked Harris to stab Sanchez. Therefore, according to the doctrine of transferred intent as described in the Supreme Court's decision in People v. Sanchez, supra, 26 Cal.4th 834, 111 Cal.Rptr.2d 129, 29 P.3d 209, they should have been held to the same criminal liability that would have been imposed had they killed Harris-first degree murder. (Ibid.) This conclusion is buttressed by the Supreme Court's statement in People v. Cervantes, supra, 26 Cal.4th at pages 872-873, footnote 15, 111 Cal.Rptr.2d 148, 29 P.3d 225, quoted above.
Contrary to defendants' suggestion, the murder convictions in the instant case were not based on a provocative act implied malice theory that would have required a finding of second degree murder. Instead, the convictions were based on defendants' express malice in attempting to kill Harris. As discussed above, an attempted murder with express malice can support a conviction under the provocative act theory. (In re Aurelio R., supra, 167 Cal.App.3d at pp. 59-60, 212 Cal.Rptr. 868; People v. Gallegos, supra, 54 Cal.App.4th at pp. 461-462, 63 Cal.Rptr.2d 382.) As also discussed, when the provocative act occurs as part of an attempted murder, as opposed to some other crime like robbery, it is not necessary that the provocative act be independent of the underlying felony. (In re Aurelio R., supra, at pp. 59-60, 212 Cal.Rptr. 868; People v. Gallegos, supra, at pp. 461-462, 63 Cal.Rptr.2d 382; see also People v. Karapetyan, supra, 106 Cal. App.4th at p. 619, 130 Cal.Rptr.2d 849.)
Section 189 expressly provides that a willful, deliberate, and premeditated killing is murder of the first degree. The jury found that defendants acted with malice, premeditation, and deliberation in attempting to murder Harris, and found that each committed at least one act in the course of the attempted murder that was a proximate cause of Sanchez's killing. Thus, defendants' mental stateexpress malice, willfulness, deliberation, and premeditationin connection with the attempted murder of Harris transferred to the killing of Sanchez, make them guilty of his murder in the first degree.

*538 E. Exclusion of Concha's Blood Alcohol Evidence
Defendants maintain that the trial court abused its discretion when it excluded evidence of Concha's blood alcohol level and refused to instruct the jury on voluntary intoxication. According to defendants, Concha's blood alcohol level was admissible under section 22 because it was relevant to his ability to form the specific intent required for each of the crimes charged.[8]
Harris was originally accosted by Hernandez, Concha, and their two accomplices at approximately 11:40 p.m. Medical records indicate that Concha was admitted to the hospital approximately an hour and a half later at 1:09 a.m., and test results showed his blood alcohol level at that time at .22.
Over Concha's objection, his blood alcohol level was redacted from the medical records admitted into evidence. The trial court reasoned that even if Concha's blood alcohol level was .22 at the hospital, there was no evidence of how much alcohol, if any, Concha consumed between the end of the incident and his admission to the hospital. Accordingly, the trial court refused to instruct the jury on voluntary intoxication and granted the prosecution's motion to redact Concha's blood alcohol level from the medical records.
The trial court did not abuse its discretion in excluding the evidence of Concha's blood alcohol level. "Evidence of voluntary intoxication, formerly admissible on the issue of diminished capacity (see generally People v. Menoloza (1998) 18 Cal.4th 1114, 1125 [77 Cal.Rptr.2d 428, 959 P.2d 735]), now is `admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.' (§ 22, subd. (b); see People v. Menoloza, supra, at p. 1126[, 77 Cal.Rptr.2d 428, 959 P.2d 735].)" (People v. Roldan (2005) 35 Cal.4th 646, 715, 27 Cal.Rptr.3d 360, 110 P.3d 289.)
Although there is evidence that Hernandez and Sanchez had been drinking beer at Hernandez's house on the evening of the incident, there is no direct evidence that Concha was drinking with them. Moreover, there is no evidence that Concha appeared intoxicated during the incident, much less that he was so intoxicated that he could not form the requisite specific intent or that he could not premeditate or deliberate. There is no evidence as to the relationship between the blood alcohol reading and the ability of Concha to have the necessary specific intent. Given the lapse of time between the incident and Concha's admission to the hospital, it was not unreasonable for the trial court to conclude that the blood alcohol evidence was speculative, especially as there was no evidence or offer of proof as to its significance. "`[Exclusion of evidence that produces only speculative inferences is not an abuse of discretion.' (People v. Babbitt (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253].)" (People v. Cornwell (2005) 37 Cal.4th 50, 81, 33 Cal.Rptr.3d 1, 117 P.3d 622.) As the trial court noted, Concha's blood alcohol level at the hospital could have been the result, in whole or in *539 part, of alcohol he consumed between the time of the incident and his admission to the hospital. Given the state of the evidence on this issue, the trial court was within its discretion to exclude the evidence of Concha's blood alcohol level.
Defendants' related assertion that the trial court erred by refusing to instruct on voluntary intoxication is not valid. "[A] defendant is entitled to an instruction on voluntary intoxication `only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' (People v. Williams (1997) 16 Cal.4th 635, 677 [66 Cal.Rptr.2d 573, 941 P.2d 752].)" (People v. Roldan, supra, 35 Cal.4th at p. 715, 27 Cal.Rptr.3d 360, 110 P.3d 289.)
As the trial court observed, there was little, if any, evidence that Concha was intoxicated at the time of the incident, and no evidence that intoxication may have affected Concha's ability to form specific intent or engage in premeditation or deliberation. Thus, as the trial court correctly concluded, there was an insufficient factual basis for an instruction on voluntary intoxication.

F.-H.[**]

DISPOSITION
The abstracts of judgment shall be modified to reflect that Hernandez was sentenced to seven years to life on Count 2, doubled to 14 years based on the prior strike conviction, and that Concha was sentenced to seven years to life on Count 2. The abstracts shall also be corrected to reflect that Hernandez received 496 days of custody credit and that Concha received 489 days of custody credit. In all other respects, the judgments of conviction are affirmed.
I concur ARMSTRONG, J.
TURNER, P.J.
I concur in the judgment except I would reduce the murder convictions from first to second degree. I agree with the Attorney General that there is substantial evidence to support liability on a provocative act theory. But defendants are correct: the fact that the provocative act theory applies does not permit the return of first degree murder verdicts; transferred intent rules do not apply to this case; and because the decedent, Max Sanchez, was an accomplice, the first degree findings cannot be justified on a felony-murder rule theory.
The provocative act doctrine is a form of implied malice which allows an accused to be convicted of second, degree murder. The controlling authority is in the following language in People v. Nieto Benitez (1992) 4 Cal.4th 91, 109-110, 13 Cal. Rptr.2d 864, 840 P.2d 969: "Other authority also supports the People's contention that, where the defendant obtains a lethal weapon and then engages the victim in an argument, malice may be impliedfrom the circumstances leading to the killing to support a conviction of second degree murder. (See, e.g., People v. Rosenkrantz (1988) 198 Cal.App.3d 1187, 244 Cal.Rptr. 403 [defendant, incensed that his younger brother and an acquaintance had discovered defendant's homosexuality, purchased a semiautomatic weapon went to the acquaintance's residence armed with the weapon, engaged him in an argument, and then fatally shot him]; In re Russell H. (1987) 196 Cal.App.3d 916, 242 Cal.Rptr. 488 [minor's retrieval of a handgun for the purpose of coercing a drug seller to give him drugs, followed by an argument and *540 discharge of the weapon, resulting in unintentional death of victim]; People v. Summers (1983) 147 Cal.App.3d 180, 195 Cal. Rptr. 21 [defendant's efforts in locating intended victim, making a special trip to arm himself with a concealed weapon, and then producing the weapon in a threatening fashion in victim's presence provided ample evidence of defendant's implied malice to support second degree murder conviction]; People v. Love (1980) 111 Cal. App.3d 98, 168 Cal.Rptr. 407 [following argument between defendant and victim over use of victim's vehicle, defendant placed gun near victim's head and, after victim continued to argue, pulled the trigger].)" As explained in Nieto Benitez, other decisions also describe that provocative conduct can amount to implied malice which will support a second degree murder conviction. (People v. Curry (1961) 192 Cal.App.2d 664, 674-675, 13 Cal.Rptr. 596 ["`Thus if the natural consequences of an unlawful act be dangerous to human life, then an unintentional killing proximately caused by such act will be murder in the second degree, even though the unlawful act amounted to no more than a misdemeanor'"]; People v. Hubbard (1923) 64 Cal.App. 27, 37, 220 P. 315 [upholding instruction that stated if a "killing `is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, ... this is murder of the second degree'" (original italics) ]; see People v. Benson (1989) 210 Cal.App.3d 1223, 1225, 1228-1231, 259 Cal.Rptr. 9.) One decision following Nieto Benitez explains that when malice is implied from provocative conduct, the accused may be convicted of second degree murder. (See People v. Karapetyan (2003) 106 Cal.App.4th 609, 619, 130 Cal.Rptr.2d 849.)
Nor do cases discussing transferred intent change matters. The Attorney General, while discussing the instructional error issue and at oral argument, relies on People v. Sanchez (2001) 26 Cal.4th 834, 852, 111 Cal.Rptr.2d 129, 29 P.3d 209. Our Supreme Court explained its holding in Sanchez thusly: "The circumstance that it cannot be determined who fired the single fatal bullet does not undermine defendant's conviction under either of the two first degree murder theories advanced against him at trial-premeditation (§ 189), and murder by means of intentionally discharging a firearm from a motor vehicle with specific intent to inflict death. (Ibid.) Defendant's act of engaging Gonzalez in a gun battle and attempting to murder him was a substantial concurrent, and hence proximate, cause of Estrada's death through operation of the doctrine of transferred intent. Sufficient evidence supports defendant's first degree murder conviction under either theory." (People v. Sanchez, supra, 26 Cal.4th at p. 839, 111 Cal.Rptr.2d 129, 29 P.3d 209.)
Sanchez discusses the classic law school question which has real life and death consequences in California: A, with malice and premeditation or under a felony murder theory, shoots at B but strikes C. That scenario is unrelated to the present case. Here, the position of the Attorney General seems to be that if A, B, and C, with premeditation and malice try to kill D who kills C first, then the mens rea of A, B, and C is transferred to themselves because of their intent vis-á-vis D-a proposition that finds no support in the common law any California statute or Sanchez. Moreover, Sanchez never discusses whether a first degree murder conviction may be returned when the malice is premised solely on provocative act analysis. Thus, Sanchez is not authority for the issue posited in this case. (People v. Braxton (2004) 34 Cal.4th 798, 819, 22 Cal.Rptr.3d 46, 101 P.3d 994; People v. Sapp (2003) 31 Cal.4th 240, 262, 2 Cal.Rptr.3d 554, 73 P.3d 433.)
*541 Nor can the Attorney General find solace in People v. Cervantes (2001) 26 Cal.4th 860, 865-874, 111 Cal.Rptr.2d 148, 29 P.3d 225, a case where the accused's second degree murder conviction premised on a provocative act was reversed for insufficiency of the evidence. Our Supreme Court identified the issue as follows, "We granted review to decide whether defendant, a member of a street gang, who perpetrated a nonfatal shooting that quickly precipitated a revenge killing by members of an opposing street gang, is guilty of murder on the facts before us." (People v. Cervantes, supra, 26 Cal.4th at pp. 862-863, 111 Cal.Rptr.2d 148, 29 P.3d 225.) Later, our Supreme Court identified the controlling issue, "In particular, the essential issue element with which we are here concerned is proximate causation in the context of a provocative act murder prosecution." (Id. at p. 866, 111 Cal.Rptr.2d 148, 29 P.3d 225.) Our Supreme Court held, on proximate cause grounds, the evidence was insufficient to support the second degree murder conviction: "In short, nobody forced the [the opposing street gang's] murderous response in this case, if indeed it was a direct response to defendant's act of shooting Linares. The willful and malicious murder of [the decedent] at the hands of others was an independent intervening act on which defendant's liability for the murder could not be based." (Id. at p. 874, 111 Cal.Rptr.2d 148, 29 P.3d 225.) Thus, Cervantes does not support the position of the Attorney General. (People v. Braxton, supra, 34 Cal.4th at p. 819, 22 Cal.Rptr.3d 46, 101 P.3d 994; People v. Sapp, supra, 31 Cal.4th at p. 262, 2 Cal.Rptr.3d 554, 73 P.3d 433.)
Finally, the felony-murder rule does not apply to this case. Mr. Sanchez was an accomplice of defendants, Julio Hernandez and Reyas Concha, in the brutal attack on Jimmie Lee Harris. The felony-murder rule does not apply under these circumstances. (People v. Washington (1965) 62 Cal.2d 777, 780-782, 44 Cal.Rptr. 442, 402 P.2d 130; 1 Witkin and Epstein, Cal.Criminal Law (3d ed.2000) § 147, p. 761.)
I would reduce the convictions for the completed homicide counts to second degree murder. This will render the instructional error contentions moot. Otherwise, I am in accord with my colleagues' conclusions.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts F, G, and H of DISCUSSION.
[1] The men were about 5 feet 5 inches or 5 feet 6 inches tall.
[2] Harris was 6 feet 2 inches tall and weighed 225 pounds.
[3] What occurred is reminiscent of the 1964 Kitty Genovese killing observed by a number of. witnesses who did nothing to help her. Harris had a cell phone and tried to call 911 himself, but was unsuccessful.
[4] Harris, who wore glasses, had them knocked off during the altercation on the side of the house.
[5] When shown a photograph of the beer bottle he recovered from the pay phone, Officer Rosa described it as "intact."
[6] All further statutory references are to the Penal Code unless otherwise indicated.
[7] The instruction on the provocative act theory of murder, to which no objection was made, read as follows: "The defendant is charged in count 1 with murder. A person can be guilty of murder under the provocative act doctrine even if someone else did the actual killing. [¶] To prove that a defendant is guilty of murder under the provocative act doctrine, the People must prove that: [¶] 1. In attempting to commit a robbery, or in attempting to commit a murder, the defendant, or an accomplice, intentionally did a provocative act; [¶] 2. The defendant or the accomplice knew that the natural and probably consequences of the provocative act were dangerous to human life and then acted in conscious disregard for life; [¶] 3. In response to the defendant's or the accomplice's provocative act, Jimmy Harris killed Max Sanchez; AND [¶] 4. Max Sanchez's cause of death was the natural and probable consequence of the defendant's or the accomplice's provocative act. [¶] A person is an accomplice of the defendant, if that person is subject to prosecution for the identical offense, and the defendant: [¶] 1. knew of that person's criminal purpose to attempt to commit robbery or to attempt to commit murder; AND [¶ 2. the defendant intended to and did in fact, aid, facilitate, promote, encourage, or instigate the attempted commission of robbery or murder. [¶] An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he is at the crime scene, even if he knows the crime will be committed or is being committed and does nothing to stop it. [¶] A provocative act is an act whose natural and probable consequences are dangerous to human life, because there is a high probability that the act will provoke a deadly response. [¶] If you find that the provocative act occurred during the course of an attempt to commit robbery, the act must also be one which goes beyond what was necessary to accomplish the robbery. [¶] In order to prove that Max Sanchez's death was the natural and probable consequence of the defendant's or an accomplice's provocative act, the People must prove that: [¶] 1. A reasonable person in the defendant's or accomplice's position would have foreseen that there was a high probability that his act could begin a chain of events resulting in someone's death; [¶] 2. The defendant's or accomplice's act was a direct and substantial factor in causing Max Sanchez's death. AND [¶] 3. Max Sanchez's death would not have happened if defendant had not committed the provocative act. [¶] A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused death. [¶] Multiple Provocative Acts. The People alleged that the defendant or an accomplice committed the following provocative acts: [¶] threatening to kill Jimmy Harris, and saying they had a gun; [¶] grabbing Jimmy Harris when he tried to flee the parking lot; [¶] chasing Jimmy Harris for four blocks after having threatened to kill him; [¶] stabbing Jimmy Harris with a broken bottle; [¶] beating Jimmy Harris with a whole bottle; [¶] beating Jimmy Harris with a can opener; [¶] beating Jimmy Harris with fists, while others were stabbing him. [¶] You may not find the defendant guilty unless you all agree that the People have proved that: [¶] 1. The defendant or an accomplice committed at least one provocative act; AND [¶] 2. At least one of the provocative acts committed was a direct and substantial factor that caused the killing. [¶] However, you do not all need to agree on which provocative act has been proved. [¶] If you decide the only provocative act that caused Max Sanchez's death was committed by Max Sanchez, then the defendant is not guilty of Max Sanchez's murder. [¶] In the jury verdicts, the jury stated that it had based its verdict on the first-degree murder charge on `a unanimous conclusion that the defendant personally committed a provocative act.'"
[8] The Attorney General concedes that attempted murder, attempted robbery, and aiding and abetting are crimes that require a specific intent, but contends that because a provocative act murder is premised on implied malice, voluntary intoxication is not admissible to negate such implied malice. As discussed post, however, defendants were convicted of first degree murder under the provocative act theory, based on their express malice and premeditation in Committing the attempted murder of Harris.
[**] See footnote *, ante.