Filed 10/17/24  P. v. Oliver CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>STEVEN FLOYD OLIVER,<br><br>   Defendant and Appellant. | F086513<br><br>(Super. Ct. No. 4001744)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Steven Floyd Oliver of second degree murder. The trial court sentenced defendant to 40 years to life.

On appeal, defendant argues the trial court erred in denying his motion for a judgment of acquittal pursuant to the corpus delicti rule. Defendant contends there was no independent evidence linking him to the murder other than his own statements. In the alternative, defendant argues his conviction should be reversed because there was insufficient evidence to support the jury's verdict.

The People contend the trial court correctly denied defendant's motion for acquittal because there was sufficient corroborative evidence that a crime occurred, satisfying the corpus delicti rule. The People also assert the evidence is sufficient to support the verdict. We affirm.

## PROCEDURAL BACKGROUND

On August 11, 2017, the Stanislaus County District Attorney filed an information charging defendant with murder (Pen. Code,[1] § 187, subd. (a); count 1). As to count 1, the information alleged the offense was committed willfully, deliberately, and with premeditation (§ 189)[2] and defendant personally and intentionally discharged a firearm, causing death (§ 12022.53, subd. (d)).

A jury found defendant guilty of second degree murder, and found the personal discharge of a firearm enhancement true. The trial court sentenced defendant to an indeterminate term of 40 years to life as follows: on count 1, 15 years to life, plus a consecutive 25 years to life for the firearm enhancement.

---

[1] All further statutory references are to the Penal Code.

[2] Thereafter, the court orally removed the willful, deliberate, and premeditated allegation based on representations made by the parties during trial and only instructed the jury to consider second degree murder as to count 1.

# FACTUAL BACKGROUND

## I.     Background

Defendant and his wife Sylvia Oliver[3] met in 1987.  They got married about a year later and were together ever since.  Defendant and Sylvia regularly drank alcohol.  Sylvia had cirrhosis of the liver.

Once at a wedding in 2014, a relative saw defendant brandish a knife at Sylvia and threaten her with it in an angry manner.  The knife was bigger than a pocketknife; defendant pulled it from the area of his waist.  Sylvia put both of her hands up when she saw the knife.

I.A. is Sylvia's son from a previous relationship.  He was eight years old when defendant married Sylvia.  M.O. is defendant's daughter from a previous relationship.  M.O. witnessed defendant and Sylvia fight and argue on several occasions.  Defendant told M.O. in the past that he wanted to "hit" Sylvia.  On another occasion, defendant threatened to hold his grandson's head underwater while he was swimming.  Thereafter, M.O. asked defendant to leave her house.

Defendant kept a loaded .22-caliber rifle in his bedroom corner.

## II.     The Night of the Shooting

On November 17, 2016,[4] Sylvia and defendant had recently returned from a 10-day vacation visiting Sylvia's family in Texas.  That evening, I.A. called Sylvia and asked if he could borrow her truck.  I.A. saw Sylvia at about 6:00 p.m. when she drove to his house so they could exchange vehicles.  I.A. said Sylvia seemed a "little off, not her normal self."  Sylvia was wearing sunglasses when it was dark outside.  I.A. believed Sylvia was hiding something she did not want him to see.

---

[3] Hereinafter referred to as Sylvia.  No disrespect is intended.

Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their initials.

[4] All future dates are in the year 2016 unless otherwise specified.

### III. Police Officers Respond to a 911 Call

Around 9:00 p.m. on November 17, M.O. received a disturbing call from defendant. M.O. could not understand what defendant was saying over the phone and could not hear Sylvia in the background. This was unusual because M.O. typically talked to Sylvia instead of defendant when she received calls from them. Then, defendant told M.O. that Sylvia was not breathing. He also told her, "I don't want to talk on the phone. I don't want to say anything on the phone." About five minutes after the call with defendant, M.O. called law enforcement, at approximately 9:30 p.m., and requested the police conduct a welfare check on defendant.

Police officer J. Shackelford was dispatched to defendant and Sylvia's home to conduct a welfare check at about 10:00 p.m. Shackelford knocked on the door and defendant answered. Defendant first asked Shackelford, "[W]here's my daughter?" After Shackelford told defendant that his daughter was not present, Shackelford asked defendant if defendant was arguing with Sylvia again. Defendant told Shackelford there is "no argument taking place." Then, defendant said he was trying to go to sleep when Sylvia woke him up and said, " 'Shoot me.' And [he] did." Defendant said, "[S]he's on the floor. I've been layin' with [her]." When Shackelford entered the home, Sylvia was lying face down on the kitchen floor in a pool of blood. Her legs were propped up against the kitchen cabinets.

### IV. Defendant's Statements to Law Enforcement

On the night of November 17, defendant drank some alcohol and went to bed.[5] He tried to go to sleep, but Sylvia woke him up and pulled the covers off several times. Sylvia wanted to "bitch[]," argue, and complain about her kids. Defendant was irritated because he did not want to argue with Sylvia and wanted to go to sleep. Defendant told her to " 'Shut the fuck up.' "

---

[5] On the night of the shooting, defendant's blood-alcohol level measured 0.246.

Sylvia brought defendant to the kitchen from bed. Sylvia was "sad" and was tired of "all her aches and pains." Sylvia retrieved the .22-caliber bolt-action rifle from the corner of their master bedroom. Defendant took possession of the rifle. The .22-rifle was loaded.[6] Sylvia demanded defendant shoot her. According to defendant, Sylvia told him four times, " 'Just shoot me.' " Defendant first shot one round at the kitchen floor so Sylvia was aware of what the firearm could do. It blew a hole in the tile.

Defendant was upset and told her to " '[q]uit it.' " Sylvia pointed the barrel of the rifle to her forehead and told defendant, " 'Put it right here.' " Sylvia was crouched in the kitchen praying. Defendant told Sylvia, " 'You best pray to both the devil and God 'cause you don't know where you're gonna go.' " While Sylvia was crouched in a kitchen corner praying, defendant shot her with the .22-rifle, "point blank," right between the eyes.[7]

Defendant put the gun back in the case in his bedroom after he shot Sylvia. Then, he drank an alcoholic beverage and went outside to smoke a cigarette. Defendant laid by Sylvia on the ground. Defendant called M.O. He asked her to come over and "help." He did not call the police or an ambulance because he did not want to be arrested. Defendant told police later, "I thought it was just gonna be a joke. And [the rifle] went off."

## V.    Investigation

Detective J. Evers was dispatched to defendant and Sylvia's home in response to a homicide investigation at about 11:30 p.m. Upon entering the home, Evers saw Sylvia on the kitchen floor face down. A bullet fragment and ricochet mark were found under the

---

[6] Defendant initially told law enforcement that he always kept the rifle loaded for security purposes. In a subsequent interview, defendant he said he forgot the rifle was loaded.

[7] Defendant's statement varies as to whether Sylvia "laid" down, kneeled, or squatted in the kitchen corner when defendant shot her.

mat on the kitchen floor beneath Sylvia's body. Sylvia had a gunshot wound on her forehead in between her two eyebrows. Sylvia was pronounced dead at the scene.

Evers found a loaded .22-caliber "bolt action rifle" inside the brown leather case propped up in a corner of defendant's bedroom where defendant said he put it after he shot Sylvia. There was a shell without the casing from a spent bullet that was still in the chamber of the rifle. In the closet, Evers found an unloaded revolver and a box of ammunition. Evers did not observe any sign of forced entry into defendant and Sylvia's home.

A forensic pathologist performed an autopsy on Sylvia's body. The pathologist determined the bullet entered between Sylvia's two eyebrows and traveled to the back of the skull and straight down, exiting the bottom of her skull and became lodged in her spinal cord. Gunpowder was located under Sylvia's skin and on her skull. The gunshot wound on Sylvia's forehead was circular with blackened and seared skin margins, which indicated that the muzzle of the firearm was in contact with the skin when it was discharged. Other injuries included a laceration on the top of Sylvia's forehead and small bruise below her right eye on her cheek that occurred after she was shot and hit the ground. Sylvia also had a bruise around her left eye that happened because of the gunshot wound. The pathologist opined that the cause of death was a contact gunshot wound to the head.

The firearms expert testified the rifle recovered from defendant's bedroom on November 17 that defendant told law enforcement he used to shoot Sylvia was a .22-caliber "[t]urn bolt action rifle" that was functioning properly. The rifle had a safety. The expert demonstrated the firing cycle of the bolt-action rifle and the involved process required to chamber a round for a subsequent shot. He said the rifle is a "shoulder fired weapon." Once a round is chambered, the shooter must shoulder the weapon, turn the safety off, and pull the trigger.

# DISCUSSION

## I.     The Corpus Delicti Rule and Sufficiency of the Evidence

Defendant argues the trial court erred when it denied his motion for acquittal based on the corpus delicti rule.  Defendant alternatively contends that his conviction should be reversed because there is insufficient corroborating evidence other than his own statements to prove he killed Sylvia, and insufficient evidence of each element of the crime to support his second degree murder conviction.

The People respond that defendant's extrajudicial statements and independent corroborative evidence were sufficient to satisfy the corpus delicti rule and support defendant's second degree murder conviction.  We agree with the People.

### A. Additional Background

Defense counsel orally moved for a judgment for acquittal under section 1118 at the close of the People's case because of the lack of corpus delicti.  He argued:

> "There is evidence to support that one bullet was fired into the floor, but . . . there's no evidence that the bullet found inside of the body was . . . a .22 caliber . . . [or that] a .22 caliber [was] fired from the rifle or a second bullet was fired from the rifle outside of my client's statement."

The prosecutor opposed the motion, arguing there was enough evidence to prove defendant's connection to the murder.

The trial court denied defense counsel's motion for acquittal based on the corpus delicti rule.  The court reasoned:

> "The corpus delicti issues are not concerns for the [c]ourt.  There's plenty of evidence to corroborate [defendant's] statements that he shot his wife in the head at point blank range.  There was . . . a bullet lodged into her spinal column, and it was determined as a result of the autopsy to be in her body . . . [defendant's] statements are sufficient with all the other circumstantial evidence and direct evidence of a homicide, a murder.
>
> ". . . [T]he [c]ourt doesn't believe that the People . . . have to show . . . a .22 bullet . . . was in the [victim's] head.  That's argument you'll be able to make to the jurors . . . but in order for the argument of corpus delicti

7.

to work, there can't be any evidence of the crime. . . . [and] there's plenty of evidence of the crime. There's just no specific evidence of which . . . type of ammunition was found.

"There are plenty of weapons in [defendant's] home, but the only one at issue here is the one that was in the bedroom, and [there] was overwhelming evidence that was submitted by not only all the People's witnesses but by the statements of [defendant]. All of elements of the homicide have been established for purposes of [a section] 1118 motion."

Thereafter, defense counsel clarified that he was also moving for a judgment of acquittal based on insufficiency of the evidence. In response, the trial court stated:

"There is sufficient evidence of each of the elements [of murder] in light of the rules of corpus delicti that has been presented by the People to withstand [a section] 1118 motion."

The jury received CALCRIM No. 358 instruction regarding evidence of defendant's statements and CALCRIM No. 359 instruction on the corpus delicti rule.

## B. Corpus Delicti

The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements. (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) "[T]he quantum of evidence required is not great, and 'need only be "a slight or prima facie showing" permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues.' " (*Id*. at p. 722.) "[P]hysical evidence, and reasonable inferences drawn therefrom, satisfy the corpus delicti rule." (*People v. Jennings* (1991) 53 Cal.3d 334, 367.) "The identity of the perpetrator is not an element of the corpus delicti." (*People v. Kraft* (2000) 23 Cal.4th 978, 1057; see (*ibid*.) [a naked body found beside a road in a trash bag with a rope around the victim's ankles and wrists supplied a prima facie showing of criminal agency in connection with death of the victim and satisfied the corpus delicti rule].)

Our Supreme Court held there was ample physical evidence to comply with the corpus delicti rule, where the victims' burnt bodies, .45-caliber bullets, and one bullet

8.

casing was recovered at the scene of murder victims. (*People v. Capers* (2019) 7 Cal.5th 989, 1003.) This physical evidence of criminal agency also matched the defendant's statement to the police, that he fired the fatal shots that killed one of the victims, hid the .45-caliber gun and bullet casings, poured gasoline on the victims, and lit them on fire. (*Ibid.*) Similarly, in *People v. Ogg* (1958) 159 Cal.App.2d 38, 48, the Second Appellate District held a prima facie showing of the corpus delicti of murder was found when the defendant's wife was found dead in their home with the presence of abrasions, bruises, and other injuries not consistent with an ordinary fall, and the defendant failed to inform his friends or seek aid at the time of his wife's asserted fall.

Under these standards, the corpus delicti rule was satisfied. Sylvia's body was found shot to death on the kitchen floor. An autopsy concluded Sylvia died from a contact gunshot wound between her eyebrows. When a dead body is found with a contact gunshot wound to the head, an inference arises that there is a loss, injury, or harm through the involvement of a criminal agency, satisfying both prongs of the corpus delicti rule. (See *People v. Jennings*, *supra*, 53 Cal.3d at p. 367 [a dead body with a broken jaw satisfies the corpus delicti of murder, evidence that the victim died through the involvement of a criminal agency].)

Further, the way the bullet entered Sylvia's body and was found lodged in her spine indicated she was beneath the muzzle of the rifle that was in contact with her skin when it was discharged. A bullet fragment and ricochet mark were found under the mat on the kitchen floor beneath where Sylvia's body fell. Defendant was found home alone with Sylvia's dead body but failed to obtain medical attention. From these factors, it may be inferred that another person shot Sylvia through the involvement of a criminal agency; it was not suicide.

The corpus delicti was therefore established by the physical evidence found on the night of the murder, autopsy report, testimony from the forensic pathologist regarding the cause of Sylvia's death, and witness testimony. (See, e.g., *People v. Ramirez* (1979) 91

9.

Cal.App.3d 132, 137–138 [the introduction of a coroner's report showing the victim died from a gunshot wound, from which the trial court was free to accept a conflicting inference that the victim's fatal gunshot wound was not self-inflicted, and spontaneous statements of persons present at the shooting, established the corpus delicti of manslaughter].)

## C. Sufficiency of the Evidence

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077.) A reviewing court must also " 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Flores* (2020) 9 Cal.5th 371, 411.) "Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

First, defendant argues that there is insufficient corroborating evidence other than defendant's own statements to prove he killed Sylvia. However, once a criminal act has been satisfied for the purpose of the corpus delicti rule, " 'defendant's statements may be considered to strengthen the case on all issues.' " (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 722; see *People v. Manson* (1977) 71 Cal.App.3d 1, 42 ["[t]he defendant's admissions or confessions are competent evidence after prima facie proof of the corpus

delicti is made and may of themselves be sufficient to establish his connection with the crime"].)

The jury could have properly considered defendant's statements regarding how the couple had an argument and Sylvia crouched on the kitchen floor and prayed to "God" when defendant picked up his loaded .22-rifle and shot her "point blank" between the eyes. The jury could have also considered defendant's comments regarding how after he shot Sylvia he put the .22-rifle back in its case in his bedroom, where it was later found by law enforcement. In addition to the evidence mentioned above, defendant's statements to law enforcement matched the physical evidence and provided sufficient independent evidence of " 'injury, loss, or harm by a criminal agency.' " (See, e.g., *People v. Capers*, *supra*, 7 Cal.5th at p. 1003.)

Turning to whether there was sufficient evidence to support each element of defendant's second degree murder conviction, we also conclude the evidence was sufficient.

Second degree murder is defined as the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a); *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) Implied malice is present "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."[8] (§ 188 subd. (a)(2); see *People v. Mattison* (1971) 4 Cal.3d 177, 182.) Defendant's words alone may establish the degree of his crime and when matched with the physical evidence, provide sufficient evidence to show the defendant killed the victim. (*People v. Capers supra*, 7 Cal.5th at p. 1003 [the defendant's words alone may establish the degree of his crime or his identity as the perpetrator].)

---

[8] We need not consider express malice. The People argued the theory of implied malice to support the second degree murder conviction and we find the evidence sufficient to support defendant's conviction on an implied malice theory.

11.

Here, a jury could have reasonably considered the circumstances leading up to the shooting to support the conviction. Defendant and Sylvia had an argument on the night of the murder. He was angry and told her to " '[s]hut the fuck up.' " Defendant took possession of a loaded rifle and shot a warning shot into the floor that blew a hole in the kitchen tile. Thereafter, he shot Sylvia. Defendant's possession of a lethal weapon during a heated argument and the weapon's subsequent discharge supports a second degree murder conviction. (See, e.g., *People v. Nieto Benitez*, *supra*, 4 Cal.4th at pp. 107–108 [the defendant's act of brandishing a firearm and its subsequent discharge during "a heated dispute" justifiably could lead a jury to reach a verdict of second degree murder]; *People v. Summers* (1983) 147 Cal.App.3d 180, 184–185 [the defendant's efforts in locating intended victim, making a special trip to arm himself with a weapon, and then producing the weapon in a threatening fashion in the victim's presence provided ample evidence of the defendant's implied malice to support second degree murder conviction].)

The jury also was entitled to consider defendant's conduct following Sylvia's death. (*People v. Ogg*, *supra*, 159 Cal.App.2d at p. 51 [implied malice found where the defendant's failure to seek assistance or obtain medical aid even though the defendant knew his wife was seriously injured indicated a heartless attitude and callous indifference toward her, which supported the defendant's conviction for second degree murder].) Defendant did not call law enforcement or seek medical attention after Sylvia was shot, rather, he drank alcohol and smoked a cigarette. He was angry when law enforcement arrived. A jury could reasonably infer from the circumstances surrounding defendant's conduct after the shooting that he left Sylvia to die. The jury may also have been convinced that defendant's failure to obtain medical aid or call law enforcement even though he knew Sylvia had been shot indicated an " 'abandoned and malignant heart' " to support a second degree murder conviction. (See *People v. Burden* (1977) 72 Cal.App.3d 603, 621.)

Defendant contends the prosecutor's closing argument only relied on defendant's own statements, which were insufficient to establish that defendant murdered Sylvia. However, we note several instances in the prosecutor's closing argument where she relies on facts other than defendant's statements to law enforcement. Despite this, the court also properly instructed the jury before closing arguments when it said, "[W]hat counsel says is not evidence . . . you may rely on the evidence presented in the trial and the law as stated by [the court]." The jury is presumed to adhere to the court's instructions, not attorney argument. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 386.)

Defendant also argues there were flaws in law enforcement's investigation of the crime that defense counsel highlighted at trial, which may tend to show defendant did not murder Sylvia. Defendant's focus on evidence absent from the prosecution's case misapplies the standard of review. When assessing the sufficiency of the evidence, our Supreme Court concluded that the focus should not be on evidence that is lacking from the prosecution's case but inferences the jury might have logically drawn from the evidence presented. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 12.) The jury considered the evidence, was presented with the arguments, and rejected defense counsel's theory. Emphasizing what law enforcement failed to do does not govern whether the evidence before us is substantial. Here, the jury was provided with physical evidence corroborated by defendant's statements that support defendant's conviction for second degree murder.

Defendant cites *People v. Blakeslee* (1969) 2 Cal.App.3d 831, 837 in support of his sufficiency of the evidence claim. There, the Second Appellate District found insufficient evidence where there was nothing connecting the defendant to the murder other than the fact that the defendant could be placed at the murder scene. (*Id*. at pp. 837–840.) The court noted that the absence of a murder weapon or any evidence "linking the defendant in some manner to a weapon" was crucial to its finding of insufficient evidence. (*Id*. at pp. 839–840.) Unlike in *Blakeslee*, the prosecution

presented evidence linking defendant to the murder weapon, a loaded .22-bolt action rifle Evers found in defendant's bedroom on the night of the murder, which defendant told law enforcement he used to kill Sylvia. There was also other physical evidence linking defendant to Sylvia's murder, including the bullet fragment found on the kitchen floor, and the way the muzzle of the rifle was used to shoot Sylvia "point blank" in between the eyes, and a bullet lodged in Sylvia's spine, which corroborated the autopsy and the forensic pathologist's findings. We conclude there was sufficient evidence supporting defendant's second degree murder conviction.

## **DISPOSITION**

The judgment is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

14.